[No. B003557. Second Dist., Div. Three. Jan. 29, 1985.]

MITTIE F. HOBBS, Individually and as Trustee, etc.,
Plaintiff and Respondent, v.
BATEMAN EICHLER, HILL RICHARDS, INC., et al.,
Defendants and Appellants.

**COUNSEL**

Bodkin, McCarthy, Sargent & Smith and Timothy J. Sargent for Plaintiff and Respondent.

Gibson, Dunn & Crutcher, Phillip L. Bosl, Robert D. Brain and Gregory N. Barrick for Defendants and Appellants.

## Opinion

### ARABIAN, J.—

#### Introduction

Plaintiff and respondent Mittie F. Hobbs, individually, and Mittie F. Hobbs, trustee of that trust agreement dated December 23, 1974 (Mrs. Hobbs), was awarded $96,000 in compensatory damages against defendants and appellants Bateman Eichler, Hill Richards, Incorporated and Alan Ravenscroft (individually, Bateman Eichler and Ravenscroft and, collectively, appellants) and $220,000 in punitive damages against Bateman Eichler by a jury which determined that appellants had breached their fiduciary duties to Mrs. Hobbs. Mrs. Hobbs showed that appellants had made unsuitable investments for her, had "churned" her account, had made transactions without obtaining her permission and had failed to advise her of substantial losses in her account. The trial court denied appellants' motions for judgment notwithstanding the verdict and for new trial and entered judgment on the verdicts. Appellants appealed. We affirm the judgment and orders of the trial court.

#### Procedural Facts

The original complaint in this action was filed on June 29, 1981. The first amended complaint alleged causes of action for fraud, negligence, fraudulent manipulation of securities, restitution and breach of fiduciary duty against Bateman Eichler, a securities broker dealer, and its registered representative, Ravenscroft.

Appellants' answer was a general denial and raised, inter alia, the affirmative defenses of waiver, estoppel, the statute of limitations and that the dispute should be referred to arbitration.

Along with their answer, appellants filed a petition to compel arbitration. Mrs. Hobbs opposed the motion, contending that since she was fraudulently induced into executing one of the customer agreements, the arbitration provisions of both agreements were without effect. The judge sitting in the master calendar court agreed with Mrs. Hobbs and denied appellants' petition. The case was assigned to another court for trial. On the first day set for trial, the trial court agreed to rehear the question whether the case should be referred to arbitration. The cause was continued and the parties were directed to brief the arbitration issue. On the following day, appellants' petition to compel arbitration was reargued to the trial court and was again

denied. No appeal was taken from either order denying appellants' petition to compel arbitration.

The case proceeded to trial. At the close of Mrs. Hobbs' case, appellants moved for a directed verdict. The motion was denied.

Before the case was submitted to the jury, Mrs. Hobbs withdrew all causes of action except the one alleging breach of fiduciary duty. The jury awarded Mrs. Hobbs $96,000 in compensatory damages against Bateman Eichler and Ravenscroft, jointly and severally, and $220,000 in punitive damages against Bateman Eichler only. After adding interest and costs, the court entered judgment on the verdict in the total amount of $330,361.75. Appellants' motions for judgment notwithstanding the verdict and for a new trial were denied.

## HISTORICAL FACTS

In accordance with the usual rules of appellate review, we view the evidence in the light most favorable to the prevailing party. The evidence shows that Arthur Hobbs died at the end of 1973 and left "everything" to Mrs. Hobbs. "Everything" consisted of the stocks, which are the subject of this lawsuit, a 1970 Cadillac and a small diamond ring. Mrs. Hobbs had no savings or money of her own. Arthur Hobbs' lawyer recommended Mrs. Hobbs to a Mr. High, an "estate lawyer." In order to pay bills and funeral expenses, Mr. High gave some of the stock from the estate to Ravenscroft to sell. When the estate closed, Mr. High recommended that Mrs. Hobbs speak with Ravenscroft, who was his own broker, about what she should do with the stock.

Arthur Hobbs during his life had not used a broker. He had handled his portfolio himself and had never told Mrs. Hobbs anything about his stock or how he handled his investments. Mrs. Hobbs had absolutely no experience or knowledge regarding securities transactions or the stock market. Therefore, in December of 1974, Mrs. Hobbs, acting on Mr. High's recommendation, contacted Ravenscroft. Ravenscroft came to Mrs. Hobbs' home and she agreed to allow him to manage the portfolio of stocks she had inherited.

According to Dr. Teweles, the expert witness who testified for Mrs. Hobbs, she had placed with Ravenscroft a good stock portfolio in that it was "conservative and well diversified." It went up and down almost precisely with the market, which means it was a low risk portfolio. Ravenscroft sold most of that original portfolio within six months and purchased other securities. During that six months the sales totalled $86,000 and purchases

totalled $98,000, a total transaction volume in Mrs. Hobbs' account of over $185,000.

Then, on July 10, 1975, Ravenscroft visited Mrs. Hobbs in her home for the second time. He told her that he had made a $35,000 profit for her during the first six months of trading. Having thus secured her confidence, Ravenscroft proposed a new investment strategy, to put her in a program of writing covered options. He explained that she would be like the bank in Las Vegas; people would buy from her and if there was a loss, the people would lose, but not Mrs. Hobbs. Mrs. Hobbs responded that she could not afford to lose any money because she had no other income. She told Ravenscroft that she expected him to take care of her investments and not put her into anything which might lose money.

In Mrs. Hobbs' presence, Ravenscroft filled out a "Customer Option Agreement and Information Form." Ravenscroft said that he recommended option writing to increase Mrs. Hobbs' income from the account. The customer option agreement becomes a permanent record of Bateman Eichler, because supervisory personnel must know the basic account information contained in that form for purposes of determining the suitability of investments made for their clients. Rule 405 of the Rules of the Board of Governors of the New York Stock Exchange requires that brokers use due diligence to learn the essential facts relative to each customer. This is known in the trade as the "know-your-customer rule."

The information Ravenscroft placed on the customer option agreement form was wrong in virtually every respect. Mrs. Hobbs was 65; Ravenscroft wrote "under sixty." Mrs. Hobbs had no income (except from the stocks); Ravenscroft wrote that her yearly income exceeded $10,000. Mrs. Hobbs had no life insurance; Ravenscroft wrote that she had life insurance with a cash surrender value of $7,000. Mrs. Hobbs had no savings; Ravenscroft reported that she had $19,000 in savings. Mrs. Hobbs never read about financial matters; Ravenscroft wrote that she read various items of literature about investing.

On the portion of the form where the types of option transactions in which the client intended to engage were to be checked, Ravenscroft checked "writing covered options." Writing covered options is an extremely conservative investment approach. Ravenscroft did not check "purchasing options," which is an extremely risky investment strategy. In the place on the form where the objectives of the account were to be indicated, Ravenscroft checked the box labeled "Income;" he did not check the boxes for "Long Term Growth" or "Speculative Trading," because that was not Mrs.

Hobbs' intent. Ravenscroft admitted at trial that Mrs. Hobbs did not read the form before she signed it.

On July 28, 1975, Ravenscroft gave Mrs. Hobbs a $16,000 check which was the premium income from the covered option program. That was the first of many checks Mrs. Hobbs would receive from Ravenscroft before she closed her account.

After July 10, 1975, the date on which Mrs. Hobbs signed the agreement to sell covered options, the "holding sheets" for Mrs. Hobbs' account, which were Ravenscroft's internal worksheets, indicated her account objectives to be "writing options" and "income" only. The holding sheets reflected that information because the Customer Option Agreement and Information Form which Ravenscroft had filled out for Mrs. Hobbs on July 10, 1975, indicated that to be her intent.

Later, however, without obtaining Mrs. Hobbs' written permission and without explaining his new investment strategy to Mrs. Hobbs, Ravenscroft placed a new sticker on the holding sheets for her account which indicated that her objectives now included "purchasing options," a very speculative investment strategy, and "income and growth." Ravenscroft admitted that purchasing options is a substantially greater risk than writing covered options.

Shortly thereafter, Ravenscroft began purchasing naked options for Mrs. Hobbs' account. Ravenscroft admitted that if the only objective of Mrs. Hobbs' account had been to produce income, he would not have been permitted to purchase naked options for her account.

In addition to purchasing well over 100 naked options, Ravenscroft began buying "recovery position" stocks. Recovery position stocks are those which the Wall Street Journal calls troubled companies stock. Ravenscroft calls them "bad news" stocks. The risk factor for recovery stocks is extremely high. Knowing this, Ravenscroft bought for Mrs. Hobbs' account: Chrysler stock when its financial problems were front page news, General Public Utilities Corporation of Pennsylvania stock immediately following the melt-down disaster at the nuclear power plant it owned at Three-Mile Island, and Sambo's stock in the face of news that its major lenders were demanding fundamental reorganization of the company because of huge financial losses. At one time Mrs. Hobbs had $38,000 invested in Sambo's and $41,000 invested in General Public Utilities of Pennsylvania, all of which was purchased within 30 days of the Three-Mile Island disaster.

Ravenscroft also purchased stocks and stock options in high-tech stocks for Mrs. Hobbs' account. These stocks are much like recovery position

stocks in that some companies survive and some do not. They are an extremely high risk investment.

On or about April 5, 1979, Ravenscroft telephoned Mrs. Hobbs. He told her that her need for cash did not always coincide with market conditions and proposed that she open a "Margin Account" with Bateman Eichler which would permit her to take money out of the account anytime she wished without having to sell her stocks. Ravenscroft mailed Mrs. Hobbs a "Customer Agreement" and checked the places for her to sign. She signed the form and returned it to Ravenscroft. Ravenscroft never explained to her that the margin agreement was in effect authorization to borrow money from Bateman Eichler.

Ravenscroft acknowledged that Rule 408 of the Rules of the Board of Governors of the New York Stock Exchange forbids a member of the exchange to exercise any discretionary power in a customer's account without first getting written consent. He further acknowledged that Mrs. Hobbs never signed a written consent for him to exercise discretion in the account and that, therefore, her approval was required in advance for each and every trade. Although there were literally 500-600 transactions in Mrs. Hobbs' account over the six and a half year period the account was open, Mrs. Hobbs, whose testimony we are required to accept on review, stated that Ravenscroft never obtained her permission to make any of the transactions. In fact, Mrs. Hobbs testified that she spoke with Ravenscroft at the most 20 times during the entire 6½ years she had her account with Bateman Eichler.[1]

Mrs. Hobbs received a "confirmation slip" for each transaction that took place in her account. She also received quarterly and yearly statements from Bateman Eichler for her three different types of accounts. Mrs. Hobbs testified that she did not know how to read the confirmation slips and that she never attempted to read them. She stated that she did not understand the statements she received from Bateman Eichler and she made no effort to understand them. She simply trusted Ravenscroft to take care of her stock portfolio for her. In fact, Ravenscroft told Mrs. Hobbs to throw away her confirmation slips and monthly notices because he had proof of her transactions and kept copies of all the records.

Dr. Teweles testified that his impression of Mrs. Hobbs' background is that she was not expert in reading security statements and confirmation slips

---

[1]Although Ravenscroft testified that he obtained Mrs. Hobbs' permission to make each and every one of the hundreds of transactions, the record shows that Mrs. Hobbs was out of town during a three-week period when over $30,000 worth of transactions were made in her account.

which are "extremely difficult" for many people to comprehend. Even Ravenscroft admitted that there was no way for Mrs. Hobbs to tell simply by looking at her Bateman Eichler statements whether she was making or losing money on her stock. She would have to look at a newspaper and compile the facts herself to get that information. Mrs. Hobbs testified that although she knew transactions were taking place in her account, she did not ask Ravenscroft about them because "she trusted him explicitly and . . . thought he was taking care of [her] account."

Mrs. Hobbs received dividend checks from the stocks on almost a monthly basis. However, Ravenscroft sent approximately 16 larger checks to Mrs. Hobbs which did not come from dividends. Mrs. Hobbs testified that if she did not have any money in the bank, she would just telephone Ravenscroft, ask for money to live on, and he would send money to her. He sent the money many times without asking how much she needed and he never explained from where the money came. Thus, Ravenscroft sent the following "special checks" to Mrs. Hobbs: July of 1975, $16,000; July of 1976, $7,836; March of 1978, $7,000; September of 1978, $10,000; April of 1979, $2,000; June of 1979, $1,000; July of 1979, $2,000; August of 1979, $2,000; October of 1979, $1,500; November of 1979, $2,000; January of 1980, $3,000; March of 1980, $3,000; June of 1980, $3,000; September of 1980, $3,000; December of 1980, $3,000; and April of 1981, $2,850.

Before the $10,000 distribution in 1978, Ravenscroft called Mrs. Hobbs and said, "'Mrs. Hobbs, you had better been [sic] sitting down when I tell you this. We just made $8,000 on one transaction in one day.'"

By April of 1980, Mrs. Hobbs was beginning to suspect there were some losses in her account because she had "nothing to live on." When she asked Ravenscroft for money he told her he would have to put her on an $800 a month budget. In early 1980, Mrs. Hobbs called Ravenscroft to see if she could have money to buy the apartment in which she was living, as the building was being converted to condominiums and she could purchase it for $25,000 less than market value. Ravenscroft told her that she could not afford the down payment and the monthly payments.

Shortly thereafter, Mrs. Hobbs called Ravenscroft again and asked him if she could have money to invest with a family member in Santa Fe land. Her conversation with Ravenscroft left her with the impression that she could not afford to make the $12,000 to $15,000 investment in the land. She then spoke with her son, Mr. Wrightsman, about the status of the account. Mr. Wrightsman telephoned Ravenscroft and inquired if Mrs. Hobbs was living off principal rather than dividends and profits from her stock. Mrs. Hobbs was also on the line. Ravenscroft told Mr. Wrightsman that

Mrs. Hobbs had been living off the principal in her account and stated, " 'Well, I guess I have been remiss in not telling her that.' " Mrs. Hobbs was shocked, as she had never been told.

Two weeks after that conversation, at Ravenscroft's request, Mrs. Hobbs met with him for lunch. The only thing he told her was that the stock market was not doing well. He did not tell her that she had suffered substantial losses in her account. After that meeting, Mrs. Hobbs was not suspicious of Ravenscroft, but she was suspicious of the nature of her account.

In January of 1981, Mrs. Hobbs did not receive her regular check from Bateman Eichler. She telephoned Ravenscroft, three times left messages for him, but he did not return her call. She finally spoke with his partner and told him she needed the check in order to pay her rent. A few days later Mrs. Hobbs received the check in the mail.

Finally, early in 1981, Mrs. Hobbs called Ravenscroft and told him to close out her account. She received only a check for $2,500, the small amount which was left in the account. When she received the check she "knew that it wasn't right, but [she] didn't know exactly what had happened." She was "devastated," as she had virtually no income except for her social security and the amount of money her son contributed to her household expenses. She had to discontinue her medical and hospital insurance coverage because of her lack of funds.

During the six years Mrs. Hobbs' account was open, she was sent so-called "happiness letters" by Troy Norlander, a stock broker and the manager of Bateman Eichler's Woodland Hills office in which Ravenscroft worked. The happiness letters are sent to only the better clients of Bateman Eichler, those whose accounts produce at least $1,000 in commissions for the firm in a single quarter. Mrs. Hobbs' account was considered by Norlander to be one of the "better accounts," because it generated $92,000 for the firm in six and a half years.

The happiness letters are essentially form letters,[2] although they are signed personally by Norlander as "Resident Manager." Hundreds of the better clients are identified by the computer and computer run-outs are given to two or three secretaries who type the letters. The top portion of the form is addressed to the client by name and expresses Norlander's appreciation for the client's business. It informs the client that it is his, Norlander's, duty to periodically review all accounts for the purpose of determining that

---

[2] At oral argument counsel for Mrs. Hobbs indicated the happiness letters have "the moral tone of junk mail."

the accounts are being handled in a manner satisfactory to the client's desires and investment objectives. It requests that the client sign and return a statement which appears on the bottom portion of the form and informs the client that he would welcome their comments regarding service of the account. Finally, Norlander invites the client to telephone him or stop in to see him if he can be of help.

The bottom portion of the form which the client is requested to sign and return states:

"Gentlemen:

"This will confirm to you that my account is being handled in a manner consistent with my investment or trading objectives. I have examined the periodic statements of my account with you and I am fully aware of the level of activity and the profits and losses incurred.

"Very truly yours,

---

"[client's name] Date

"(Please use the back of this letter if you wish to make additional comments.)"

Although only 25 percent of these form letters are actually returned to Bateman Eichler by the clients, Mrs. Hobbs signed and returned 11 of them. Moreover, on the back of the form she returned on April 24, 1979, she wrote, "I am still pleased with the way Mr. Ravenscroft has handled my $1.98. No one like him." And on the back of the form dated August 21, 1979, she wrote, "I'm delighted with the manner in which Mr. Ravenscroft has handled my account. Hope he will continue for many years. I'm so grateful to him." The last happiness letter Mrs. Hobbs signed and returned to Bateman Eichler was dated February 25, 1981, a very short time before she closed her account.

Norlander received these happiness letter forms from Mrs. Hobbs and made no further inquiries to make certain her account was in fact being handled properly, although it was his function as manager of the Woodland Hills office to supervise client trades and to see that no advantage was being taken of them. Norlander made no effort to contact Mrs. Hobbs even though he received reports on a quarterly and yearly basis which showed the enormous commissions her $80,000 account was generating for the firm.

For instance, in 1978 Mrs. Hobbs' account came to Norlander's attention through a computer run because it had generated over $29,000 in commissions that one year. Therefore, at his semi-annual review of the accounts that year to determine suitability of investments, he was aware of the large number of transactions made for Mrs. Hobbs' account. However, instead of checking the customer option agreement and information form on file with Bateman Eichler, which stated Mrs. Hobbs' account objectives and bore her signature, Norlander checked Ravenscroft's holding sheets for Mrs. Hobbs' account. Norlander testified that he saw nothing irregular. However, the holding sheets at that time had a sticker over the original account information and, as thus altered, stated that Mrs. Hobbs' account objectives were "purchasing and writing options" and "income and growth." The customer option agreement and information form on file in the Bateman Eichler compliance department, which Norlander did not check, showed her account objectives to be only "writing options" and "income." Mrs. Hobbs had never signed any document approving the purchase of options. However, Norlander relied exclusively and "totally" on Ravenscroft's holding sheets when reviewing Mrs. Hobbs' account.

When, at the end of 1980, Norlander reviewed Mrs. Hobbs' account for suitability of the investments, he knew of the 500-600 transactions which had been made for the account, knew recovery position stocks and high-tech stocks had been purchased, and knew naked options had been purchased even though Mrs. Hobbs had never signed any document permitting Bateman Eichler to purchase options for her account. Although Norlander was in charge of compliance for the Woodland Hills office, he did not contact Mrs. Hobbs to see if Ravenscroft had checked with her before making these transactions. In fact, even in retrospect, Norlander testified that he believed Mrs. Hobbs' account was handled properly by Bateman Eichler. He stated he would approve the account being handled again in the very same way.

Mrs. Hobbs' expert, Dr. Teweles, stated Mrs. Hobbs' account had not been properly handled by Bateman Eichler. According to Dr. Teweles, Bateman Eichler breached its fiduciary duty to Mrs. Hobbs. His opinion was based on (1) the unsuitability of the trades made for Mrs. Hobbs' account and (2) the clear-cut "churning" of the account.

"Churning," as defined by Dr. Teweles, means that in an account controlled by a broker there is excessive trading done primarily to benefit the broker by generating commissions in excess of those justified. If, as here, a client accepts virtually all trades, rejects none, and makes no suggestions, even though he or she could, that account is controlled by a broker.

The symptoms of "churning" are a large number of trades that exceed any reasonable basis for such trades. "Churning" can be measured by the amount of commissions being generated by the account. The purchases in Mrs. Hobbs' account exceeded $2 million. That means the average purchases per month were approximately $25,000 and that the capital was being turned over at a rate of over six times per year. The Securities and Exchange Commission "rule of thumb" is that "churning" starts at two. Bateman Eichler generated commissions of $92,000 on Mrs. Hobbs' original $80,000 account.

Dr. Teweles testified that Bateman Eichler breached its fiduciary duty to Mrs. Hobbs by selling her original portfolio of conservative and well diversified stocks and making the purchases he saw listed for her account "given her financial condition and her objectives of income." Dr. Teweles said that recovery position stocks, high-tech stocks, and naked options, all of which Bateman Eichler purchased for Mrs. Hobbs, are unsuitable investments for a person in her position. Moreover, inasmuch as Mrs. Hobbs never gave Bateman Eichler a power of attorney, known in the trade as "trading authority," she did not have a discretionary account with them. Therefore, Ravenscroft was required to receive permission from Mrs. Hobbs before making each and every transaction and he breached his fiduciary duty to her by not obtaining that permission.

The parties stipulated that had Mrs. Hobbs held the stocks she inherited until the time her account with Bateman Eichler was closed and the lawsuit filed, it would have had a value of $144,618. During that period she would have received dividends of $42,994.

## CONTENTIONS

I. This case should have been ordered to arbitration because Mrs. Hobbs offered no evidence of fraudulent inducement of the arbitration clauses in her customer agreements with appellants.

II. The trial court erred in denying Bateman Eichler's motions for new trial and for judgment notwithstanding the verdict in regard to the award of punitive damages.

A. There was no evidence of conduct by a "managing agent" of Bateman Eichler within the meaning of the punitive damages statute, Civil Code section 3294.

B. Bateman Eichler did not authorize or ratify any wrongful conduct for which punitive damages could be awarded under Civil Code section 3294.

C. There was no substantial evidence to establish a prima facie case of "oppression, fraud or malice" by Ravenscroft.

D. The punitive damage award was excessive.

III. The compensatory damage award against appellants was clearly excessive and unsupported by the evidence because it failed to take into account Mrs. Hobbs' withdrawals to meet her financial obligations.

IV. Two improper instructions given the jury were prejudicial and require reversal of the judgment.

A. The trial court's spontaneous response to the jury foreman's oral inquiry concerning appellants' burden of proof on the affirmative defenses was so prejudicial that a new trial is required.

B. The trial court improperly instructed the jury that Mrs. Hobbs could recover damages for emotional distress in this stock broker breach of fiduciary duty action.

V. The undisputed evidence reveals that Mrs. Hobbs' claims were barred by the statute of limitations, waiver and estoppel.

A. Mrs. Hobbs' breach of fiduciary duty claim was barred by limitations because (1) she knew or should have known of her claim well before June 29, 1978 and (2) the knowledge of Mrs. Hobbs' accountants, who received summaries of her trading activities in 1976, 1977 and 1978, was imputed to Mrs.. Hobbs by operation of law.

B. Mrs. Hobbs had waived and was estopped from asserting her claim for fiduciary breach of duty.

DISCUSSION

I.

*Code of Civil Procedure section 906 precludes a review by this Court of the trial courts' denials of appellants' petition to compel arbitration.*

■ This Court is precluded by Code of Civil Procedure section 906 from reviewing appellants' contention that their petition to compel arbitration of

the dispute (Code of Civ. Proc., § 1281.2) was erroneously denied.[3] The record shows that on February 17, 1982, the motion was denied by the judge sitting in the master calendar court. The motion was renewed on March 3, 1983, the first day set for trial, and the minute order of March 4, 1983, shows that appellants' motion to compel arbitration was again argued and was again denied on that date. Appellants neglected to take an appeal from either of these denials of their petition.[4]

Code of Civil Procedure section 906 provides, inter alia, that upon an appeal pursuant to section 904.1, the reviewing court may review the verdict of decision and any intermediate ruling, proceeding, order or decision which necessarily affects the judgment appealed from or which substantially affects the rights of a party. However, section 906 specifically states: "The provisions of this section do not authorize the reviewing court to review any decision or order from which an appeal might have been taken."

Code of Civil Procedure section 1294, provides in part: "An aggrieved party may appeal from: (a) An order dismissing or denying a petition to compel arbitration." (See, e.g., *Main* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1977) 67 Cal.App.3d 19 [136 Cal.Rptr. 378].) .

Inasmuch as appellants failed to appeal from the orders of two separate courts denying their petition to compel arbitration, in accordance with the express provisions of section 906, we do not review those orders of denial on this appeal. (See *Guenter* v. *Lomas & Nettleton Co.* (1983) 140 Cal.App.3d 460, 465 [189 Cal.Rptr. 470].)

---

[3]At oral argument, appellants urged that, notwithstanding their failure to timely appeal from the denials of their petition to compel arbitration, this court should review on the merits the question whether their petition was properly denied, because *Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc.* v. *100 Oak Street* (1983) 35 Cal.3d 312 [197 Cal.Rptr. 581, 673 P.2d 251], decided after the denials, would have required the trial court to grant their petition. In the *Ericksen* case, the trial court had denied 100 Oak Street's petition to compel arbitration, based on the assertion of the Ericksen firm that the lease agreement between itself and 100 Oak Street was the product of fraud. The Supreme Court, in reversing the trial court, held that a party to an agreement which includes an arbitration clause may not bypass the arbitral process and invoke the jurisdiction of the courts by merely asserting the agreement itself was the product of fraud. Appellants argue that had they known the Supreme Court would make such a definitive ruling on the issue, they would have appealed from the denials of their petition. We answer appellants' argument by two simple observations: (1) had Oak Street not appealed from the trial court's denial of its petition to compel arbitration, appellants could not now point to the *Ericksen* case in urging their cause and (2) Code of Civil Procedure section 906 specifically precludes this Court from reviewing an order from which an appeal might have been taken.

[4]We note, at the request of appellants' counsel for the instant appeal, that they were not counsel in the trial court until after judgment. Thus, appellants' counsel on appeal handled only the post-trial motion and appeal phases of this case.

## II.

*The trial court properly denied Bateman Eichler's*
*motions for new trial and judgment notwithstanding*
*the verdict in regard to the award of punitive damages.*

Bateman Eichler's contention that the trial court erred in denying its motions for new trial and judgment notwithstanding the verdict in regard to the punitive damages award against it lacks merit.

### A. *Standard of review.*

■ On appeal, the trial court's ruling on a motion for new trial must be upheld where, as here, there has been no abuse of discretion. (*Stevens* v. *Roman Catholic Bishop of Fresno* (1975) 49 Cal.App.3d 877, 889 [123 Cal.Rptr. 171].)

■ The scope of appellate review of a trial court's denial of a motion for judgment notwithstanding the verdict is to determine whether there is any substantial evidence, contradicted or uncontradicted, supporting the jury's conclusion and where so found to uphold the trial court's denial of the motion. (*Gordon* v. *Strawther Enterprises, Inc.* (1969) 273 Cal.App.2d 504, 511 [78 Cal.Rptr. 417, 39 A.L.R.3d 809]; *Stevens* v. *Roman Catholic Bishop of Fresno, supra,* 49 Cal.App.3d at p. 889.) Here, inasmuch as substantial evidence supports the jury's award of punitive damages against Bateman Eichler, the trial court did not err in denying Bateman Eichler's motion for judgment notwithstanding the verdict.

### B. *There is substantial evidence that Ravenscroft*
*was Bateman Eichler's "managing agent" within the meaning*
*of the punitive damages statute and that Bateman Eichler*
*"ratified or approved" his wrongful conduct.*

■ Bateman Eichler urges that Ravenscroft was not its "managing agent" within the meaning of the punitive damages statute (see Civ. Code, § 3294) and that Bateman Eichler did not approve or ratify any wrongful conduct. We disagree.

■ The applicable law was stated recently by our Supreme Court as follows: " ' ' "While an employer may be liable for an employee's tort under the doctrine of *respondeat superior,* he is not responsible for punitive damages where he neither directed nor ratified the act. [Citations omitted.] [¶] California follows the rule laid down in Restatement of Torts, section 909, which provides punitive damages can properly be awarded against a prin-

cipal because of an act by an agent if, but only if '(a) the principal authorized the doing and the manner of the act, or (b) the agent was unfit and the principal was reckless in employing him, or (c) *the agent was employed in a managerial capacity and was acting in the scope of employment, or (d) the employer or a manager of the employer approved or ratified the act.*' "[] [Citations.]' " (*Agarwal* v. *Johnson* (1979) 25 Cal.3d 932, 950 [160 Cal.Rptr. 141, 603 P.2d 58], italics added.)

The determination whether employees act in a managerial capacity does not hinge solely on their level or position in the corporate hierarchy. (*Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 822 [169 Cal.Rptr. 691, 620 P.2d 141], cert. den. and app. dism., *Mutual of Omaha Ins.* v. *Egan* (1980) 445 U.S. 912 [63 L.Ed.2d 597, 100 S.Ct. 1271].) "Rather, the critical inquiry is the degree of discretion the employees possess in making decisions that will ultimately determine corporate policy." (*Id.*, at pp. 822-823.)

██ There is substantial evidence that Norlander, the officer manager of Bateman Eichler's Woodland Hills office, possessed that broad degree of discretion in decision making which determined Bateman Eichler's corporate policy. Norlander testified that he was the office manager and he signed himself as such on the Customer Option Agreement and Information Form which Mrs. Hobbs signed. Norlander stated that he supervised the trades being made for clients to be certain no advantage was taken of them, that he supervised all 8,000 accounts in the office, that semi-annually he checked to see if suitable securities were being purchased for clients, that he was responsible for making sure the accounts were not being "churned," and that in general he was in charge of compliance in the Woodland Hills office.

Thus, Bateman Eichler's contention that Norlander's duties were limited *solely* to ministerial tasks is completely without support in the record. Without question, Norlander was a managing agent for purposes of imposing punitive damages on Bateman Eichler under Civil Code section 3294.

Section 3294 also permits an award of punitive damages against a corporation whose managing agent authorized, ratified, or approved the wrongful act. (*Agarwal* v. *Johnson, supra,* 25 Cal.3d at p. 950; *Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d at p. 822.) Norlander testified that when he reviewed Mrs. Hobbs' account at the end of December of 1980, he looked at Ravenscroft's holding sheets, that he knew how many transactions there had been to her account, knew about the purchases of Chrysler stock, Sambo's stock, General Public Utilities of Pennsylvania stock, knew about the purchases of naked options and knew that she had not checked the box on her customer option agreement and information form to indicate she

would permit the purchase of options. Norlander not only approved the account for that December of 1980 review, and apparently for every other semi-annual review, but even at trial, with full knowledge of all the facts, he testified that he approved of the way Mrs. Hobbs' account was handled. He declared in open court that if the same account came to Bateman Eichler in the future, he would approve it being handled in exactly the same fashion.

In light of the foregoing facts, there is substantial evidence that Norlander, Bateman Eichler's Woodland Hills office manager, ratified and approved Ravenscroft's wrongful conduct. Since he was at the "level of responsible corporate management" (*Hartman* v. *Shell Oil Co.* (1977) 68 Cal.App.3d 240, 249 [137 Cal.Rptr. 244]), his testimony leaves no doubt but that the manner in which Mrs. Hobbs' account was managed by Bateman Eichler is authorized by company policy.

> C. *There is substantial evidence that Ravenscroft*
> *was guilty of "oppression, fraud or malice" within*
> *the meaning of Civil Code section 3294.*

■ Bateman Eichler contends the punitive damages awarded against it are unwarranted because there is no substantial evidence that Ravenscroft was guilty of "oppression, fraud or malice." That contention is patently absurd.

■ We agree that section 3294 of the Civil Code requires that an award of punitive damages be based on a showing of "oppression, fraud or malice." (*Colonial Life and Accident Ins. Co.* v. *Superior Court* (1982) 31 Cal.3d 785, 792 [183 Cal.Rptr. 810, 647 P.2d 86].) Therefore, to be liable for punitive damages, a defendant must act " ' ' "with the intent to vex, injure, or annoy, *or with a conscious disregard of the plaintiff's rights.* [Citations.]" ' " ' " (*Taylor* v. *Superior Court* (1979) 24 Cal.3d 890, 895 [157 Cal.Rptr. 693, 598 P.2d 854], original italics; *Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 922 [148 Cal.Rptr. 389, 582 P.2d 980]; *Silberg* v. *California Life Ins. Co.* (1974) 11 Cal.3d 452, 462 [113 Cal.Rptr. 711, 521 P.2d 1103].) However, these elements may be proven directly or by implication. (*Colonial Life & Accident Ins. Co.* v. *Superior Court, supra,* 31 Cal.3d at p. 792; *Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d at p. 923, fn. 6; *Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 65-66 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].)

■ In this case, the evidence is overwhelming that Ravenscroft acted with a conscious disregard for Mrs. Hobbs' rights. He falsified information on the customer option agreement and information form, the document which Bateman Eichler purportedly used to determine the suitability of

client investments. He never asked Mrs. Hobbs' permission before making hundreds of purchases and sales of securities for her account, although he knew he was required by securities regulations to obtain written approval beforehand. He sold her "blue chip" portfolio of stocks and thereafter purchased unsuitable securities for her. He neglected to tell her that she had suffered immense losses in the market and that she was living on the principal of her account, rather than on dividends and profits, as she assumed. He "churned" the account unmercifully in order to make excessive commissions for Bateman Eichler and for himself.

These faithless acts are clear and substantial evidence of Ravenscroft's total and conscious lack of regard for the rights of his fiduciary, Mrs. Hobbs.

### D. *The punitive damages award against Bateman Eichler was not excessive.*

Equally unmeritorious is Bateman Eichler's claim that the $220,000 punitive damages award against it was excessive and should be reduced by this court.

Our review of punitive damage awards rendered at the trial level "is guided by the 'historically honored standard of reversing as excessive only those judgments which the entire record, when viewed most favorably to the judgment, indicates were rendered as the result of passion and prejudice . . . .' [Citation.] Stating the matter somewhat differently . . . an appellate court may reverse such an award 'only " '[w]hen the award as a matter of law appears excessive or where the recovery is so grossly disproportionate as to raise a presumption that it is the result of passion or prejudice.' " ' [Citation.]" (*Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d at pp. 927-928.)

In *Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d 910, our Supreme Court set forth the principles guiding the assessment whether the punitive damages are excessive: "One factor is the particular nature of the defendant's acts in light of the whole record; clearly, different acts may be of varying degrees of reprehensibility, and the more reprehensible the act, the greater the appropriate punishment, assuming all other factors are equal. [Citations.] Another relevant yardstick is the amount of compensatory damages awarded; in general even an act of considerable reprehensibility will not be seen to justify a proportionally high amount of punitive damages if the actual harm suffered thereby is small. [Citation.] Also to be considered is the wealth of the particular defendant; obviously, the function of deterrence . . . will not be served if the wealth of the defendant allows him to

absorb the award with little or no discomfort. [Citations.] By the same token, of course, the function of punitive damages is not served by an award which, in light of the defendant's wealth and the gravity of the particular act, exceeds the level necessary to properly punish and deter." (*Id.,* at p. 928.)

Applying these considerations to the instant case, we reject Bateman Eichler's contention that the award of punitive damages was excessive as a matter of law. Viewing the record in the light most favorable to the judgment, the jury and the court properly concluded that the conduct of Bateman Eichler was highly reprehensible, inasmuch as a widow was stripped of her only means of support as a result of Bateman Eichler's utterly callous disregard of her rights.

Looking at the second yardstick, we find the 2.3 ratio of punitive damages to compensatory damages is not disproportionate. In fact, the ratio is comparatively low. (See *Ferraro* v. *Pacific Fin. Corp.* (1970) 8 Cal.App.3d 339, 353 [87 Cal.Rptr. 226], and cases cited therein; and see *Chodos* v. *Insurance Co. of North America* (1981) 126 Cal.App.3d 86 [178 Cal.Rptr. 831]; *Zhadan* v. *Downtown Los Angeles Motor Distributors, Inc.* (1979) 100 Cal.App.3d 821 [161 Cal.Rptr. 225].)

Considering Bateman Eichler's wealth, again we find that the award, which amounted to 1 percent of Bateman Eichler's $22 million net worth, is not excessive as a matter of law. (See, e.g., *Schomer* v. *Smidt* (1980) 113 Cal.App.3d 828 [170 Cal.Rptr. 662]; *Zhadan* v. *Downtown Los Angeles Motor Distributors, Inc., supra,* 100 Cal.App.3d 821; *Ferraro* v. *Pacific Fin. Corp., supra,* 8 Cal.App.3d at pp. 352-353.)

As our Supreme Court stated in *Bertero* v. *National General Corp., supra,* 13 Cal.3d 43, punitive damages are awarded against a defendant " 'for the sake of example and by way of punishing' him (Civ. Code, § 3294). It follows that the wealthier the wrongdoing defendant, the larger the award of exemplary damages need be in order to accomplish the statutory objective. [Citations.]" (*Id.,* at p. 65.)

Again, viewing the facts in the light most favorable to the judgment, we find that Bateman Eichler's conduct amounted to a breach of fiduciary duty to its client, which is precisely the type of tortious conduct that an award of punitive damages is designed to deter. The $220,000 award of punitive damages against Bateman Eichler was not excessive.

### III.

*The compensatory damages award was not excessive.*

Appellants urge that the award of $96,000 in compensatory damages was excessive and not supported by the evidence. The award is precisely the

amount requested by Mrs. Hobbs' counsel in oral argument to reimburse her for her financial loss. Counsel's argument and the compensatory damages instruction for the jury was based on the case of *Twomey* v. *Mitchum, Jones & Templeton, Inc.* (1968) 262 Cal.App.2d 690, 730 [69 Cal.Rptr. 222]. In *Twomey,* defendants, a stock brokerage firm and its manager, breached their fiduciary duties in advising plaintiff to switch into unsuitable investments and to engage in excessive transactions. The appellate court held that the trial court had not erred in computing plaintiff's damages as follows: the value of her securities at the time she was advised by defendant to change her portfolio, plus the amount such securities would have earned had she kept them, less the value of securities and cash returned to plaintiff by defendants.

In this case, the jury awarded Mrs. Hobbs compensatory damages in exact conformance with the *Twomey* formula. The jury received the following stipulation: "The original portfolio of stocks inherited by Mrs. Hobbs and deposited with Bateman Eichler . . . in December of 1974 was, on the date the complaint was filed in this action, that is June 29, 1981, valued at $144,618. [¶] From December, 1974 to June 29, 1981, that portfolio would have paid out dividends of $42,994." The jury was told that had Mrs. Hobbs retained her original portfolio, she would have had use of these amounts, a total of $187,612. From this amount counsel argued the jury should deduct the approximately $90,000 Mrs. Hobbs had withdrawn from the account. The difference is the $96,000 verdict awarded for compensatory damages.

Appellants argue that since Mrs. Hobbs would have had to live on some of the principal, no damage award can be sustained which does not take into account such necessary depletion of principal. In answer to appellants' complaint that the award of damages was not perfectly measured, we point out that " 'the wrongdoer may not object to the plaintiff's reasonable estimate of the cause of the injury and of its amount, supported by the evidence, because not based on more accurate data which the wrongdoer's misconduct has rendered unavailable.' [Citation.]" (*Speegle* v. *Board of Fire Underwriters* (1946) 29 Cal.2d 34, 46 [172 P.2d 867].) The wrongdoer must bear the risk of uncertainty which his own wrong has created. (*Ibid.*; see *Greenfield* v. *Insurance Inc.* (1971) 19 Cal.App.3d 803, 813 [97 Cal.Rptr. 164].)

IV.

*There was no prejudicial instructional error.*

Appellants urge the judgment should be reversed because the jury was improperly instructed. First, appellants contend the trial court improperly

instructed the jury that Mrs. Hobbs could recover damages for emotional distress. According to appellants, damages for emotional distress may not be awarded in an action for breach of fiduciary duty. We need not address that question, however, because the jury did not award Mrs. Hobbs any damages for emotional distress. The record shows the jury awarded Mrs. Hobbs $96,000 as compensatory damages, which was exactly the amount counsel argued would compensate her for the value of her original stocks and the dividends they would have earned had she retained them (see discussion, *supra,* at section III).

 "Error is considered prejudicial when it appears probable that an improper instruction misled the jury and affected its verdict. [Citation.]" (*Krouse* v. *Graham* (1977) 19 Cal.3d 59, 72 [137 Cal.Rptr. 863, 562 P.2d 1022].) Here, since the instruction had no effect whatever on the verdict, it is manifest that appellants suffered no harm because it was given.

 Next, appellants claim that "without conferring with counsel, the court spontaneously and erroneously responded to the jury foreman's oral inquiry concerning affirmative defenses in such manner that suggested to the jury that the appellants *were required to prove intentional fraud on plaintiff's part* in order to establish their affirmative defenses. . . ." (Original italics.)[5]

Appellants note that in the course of their deliberations the jury had *four* questions for the trial court and that all four questions dealt with what Bateman Eichler and Ravenscroft were required to prove in order to establish their affirmative defenses.

Our review of the record shows that during their deliberations, the jurors returned to the courtroom and submitted *three* questions to the court. The first question was: " 'What is estoppel and how does it relate to this case?' " The second question was: " 'What is the statute of limitations and how does it relate to this case?' " The third question was: " 'Could the happiness letters signature at the bottom be considered as a waiver?' "

In response to the first two questions, the court reread to the jury the instructions regarding estoppel and the statute of limitations. In response to the third question, whether the signature at the bottom of the happiness letters could be considered as a waiver, the trial court told the jury it could,

---

[5]We find that appellants preserved this issue for review on appeal by stating on the record, after the jury verdict, that they had attempted to call a conference before the jury verdict with regard to the oral question of juror Hall. Appellants stated that they wished a conference "so that the jury could be reinstructed in that matter, and that the court declined with regard to the same."

depending on what they found to be the facts and if those facts fit within the legal definition of waiver. The court then read to the jury the instruction dealing with waiver. Thereafter, the following colloquy took place between the jury foreman and the court:

"[THE COURT:] Now, does that answer your questions?

"JUROR HALL: I believe so.

"THE COURT: All right.

"JUROR HALL: I believe we still may have some confusion regarding the happiness letters and whether Bateman Eichler needs to prove that Mittie Hobbs intentionally defrauded them by returning them with her signature.

"Do they have to prove that she intentionally—

"THE COURT: They have the burden of proof on the affirmative defenses. The defendants have the burden of proof on the affirmative defenses.

"All right if that answers your questions, I will ask you to please return and continue your deliberations.

"JUROR HALL: Thank you."

We find the so-called "instruction" by the court about which appellants complain was innocuous. The court merely answered the juror's inquiry by reiterating that the defendants had the burden of proof on the affirmative defenses. That was a correct statement of the law.

Moreover, the record shows that if there was confusion in the minds of the jurors it was due to appellants' own conduct. Appellants' counsel argued to the jurors that if all the information in the letters signed by Mrs. Hobbs was false, that "means that she has *misrepresented* to Mr. Norlander 11 times." (Italics added.) Appellants' counsel also argued to the jury that if they believed Mrs. Hobbs' testimony, "then she has at least on 11 occasions committed *wrongful acts* to Bateman Eichler." (Italics added.)

Further, the following special instruction was given to the jury at appellants' request: "Whenever a party has, by the party's own statement or conduct, *intentionally and deliberately* led another to believe a particular

thing true and to act upon such belief, that party is not, in any litigation arising out of such a statement or conduct, permitted to contradict it.'' (Italics added.)

The instruction on estoppel, also requested by appellants, stated: "In this affirmative defense, the defendants Bateman Eichler and Ravenscroft must prove that plaintiff Hobbs, by statement or conduct, *intentionally and deliberately* led defendants Bateman Eichler or Ravenscroft to believe that she knew and understood the nature of the transactions in her account, and that Bateman Eichler acted upon that belief. . . .'' (Italics added.)

Appellants point out that the likelihood of prejudice is great because the only guidance the jury had on what constitutes "fraud" was the following jury instruction regarding the type of conduct that can support a punitive damages award: "Fraud means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving the person of property, legal rights or otherwise causing injury.''

Appellants' concern that they were prejudiced because the court misled the jury into believing that Bateman Eichler had an affirmative duty to prove that Mrs. Hobbs *intentionally misrepresented* a material fact is not supported by the record. If the jurors entertained that belief, it was the product of appellants' requested instructions and their own arguments to them, not the comments of the court. (See, e.g., *LeMons* v. *Regents of University of California* (1978) 21 Cal.3d 869, 876 [148 Cal.Rptr. 355, 582 P.2d 946].)

Further, even a questionable instruction is not a ground for reversal where the rights of the appellant were clearly stated to the jury in other instructions. (*Martin* v. *Vierra* (1939) 34 Cal.App.2d 86, 94 [93 P.2d 261].) The instructions must be considered as a whole. (*Ibid.*) Here, the court properly instructed the jurors on each of the affirmative defenses on which appellants had the burden of proof.

■■■ "A judgment may not be set aside on the ground the jury was misdirected unless a reviewing court, after an examination of the entire cause, including the evidence, shall be of the opinion that the error has resulted in a miscarriage of justice. [Citations.]'' (*Kostecky* v. *Henry* (1980) 113 Cal.App.3d 362, 373 [170 Cal.Rptr. 197].) There was here no such miscarriage of justice. If there was any error, it was harmless.

V.

*Mrs. Hobbs' action for breach of fiduciary duty
was not barred by limitations, waiver or estoppel.*

 Appellants contend Mrs. Hobbs' action for breach of fiduciary duty was barred by limitations, waiver and estoppel. We find no merit to any of these contentions.[6]

Mrs. Hobbs' complaint was filed on June 21, 1981. The jury was instructed that the statute of limitations for a breach of fiduciary duty claim is "three years from the time the plaintiff has knowledge or notice of the facts constituting the breach." Appellants argue that Mrs. Hobbs knew or should have known of her breach of fiduciary claim well before June 29, 1978. Appellants point to the fact that Mrs. Hobbs received a confirmation slip for each and every transaction which occurred in her account and received monthly and quarterly statements showing every transaction. Further, appellants note that each year Mrs. Hobbs' accountant prepared a tax return for her, detailing the profits and losses which occurred in her account. In fact, appellants contend that the knowledge of Mrs. Hobbs' accountant is imputed to her as a matter of law under principals of agency (Civ. Code, § 2332).

The relevant law is clear. " 'The relationship between broker and principal is fiduciary in nature and imposes on the broker the duty of acting in the highest good faith toward the principal. [Citations.]' " (*Twomey* v. *Mitchum, Jones & Templeton, Inc., supra,* 262 Cal.App.2d at p. 709; see *April Enterprises, Inc.* v. *KTTV* (1983) 147 Cal.App.3d 805, 830 [195 Cal.Rptr. 421], mod. at 148 Cal.App.3d 484d.)

In *Neel* v. *Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176 [98 Cal.Rptr. 837, 491 P.2d 421], our Supreme Court stated: "The duty of a fiduciary embraces the obligation to render a full and fair disclosure to the beneficiary of all facts which materially affect his rights and interests. 'Where there is a duty to disclose, the disclosure must be full and complete, and any material concealment or misrepresentation will amount to fraud. . . .' [Citation.]" (*Id.,* at pp. 188-189.)

 Where a fiduciary relationship exists, facts which ordinarily require investigation may not incite suspicion (*Bennett* v. *Hibernia Bank*

---

[6]We have reviewed the federal cases cited to us by appellants in support of their contention that Mrs. Hobbs' action was barred by limitations, waiver or estoppel. We have found them, without exception, readily distinguishable on their facts and not authority for the propositions for which they were cited.

(1956) 47 Cal.2d 540, 560 [305 P.2d 20]) and do not give rise to a duty of inquiry (*id.*, at p. 563). Where there is a fiduciary relationship, the usual duty of diligence to discover facts does not exist. (*United States Liab. Ins. Co.* v. *Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586, 598 [83 Cal.Rptr. 418, 463 P.2d 770].)

Thus, a plaintiff need not establish that she exercised due diligence to discover the facts within the limitations period unless she is under a duty to inquire and the circumstances are such that failure to inquire would be negligent. (2 Witkin, Cal. Procedure (2d ed. 1970) Actions, § 340, p. 1182; accord *Hobart* v. *Hobart Estate Co.* (1945) 26 Cal.2d 412, 437-438 [159 P.2d 958].) Where the plaintiff is not under such duty to inquire, the limitations period does not begin to run until she *actually* discovers the facts constituting the cause of action, even though the means for obtaining the information are available. (*Ibid.*)

The distinction between the rules excusing a late discovery of fraud and those allowing late discovery in cases in the confidential relationship category is that in the latter situation, the duty to investigate may arise later because the plaintiff is entitled to rely upon the assumption that his fiduciary is acting on his behalf. (*Bedolla* v. *Logan & Frazer* (1975) 52 Cal.App.3d 118, 131 [125 Cal.Rptr. 59].) However, once a plaintiff becomes *aware* of facts which would make a reasonably prudent person suspicious, the duty to investigate arises and the plaintiff may then be charged with knowledge of the facts which would have been discovered by such an investigation. (*Ibid.*; see *Miller* v. *Bechtel Corp.* (1983) 33 Cal.3d 868, 875 [191 Cal.Rptr. 619, 663 P.2d 177], citing *Bedolla* v. *Logan & Frazer, supra,* 52 Cal.App.3d at p. 131.)

Here, the evidence does not show that Mrs. Hobbs was aware of facts which would make her suspicious of Ravenscroft as early as June of 1978. On the contrary, her testimony, and that of Ravenscroft, shows that it was not until the early part of 1980 that she even became aware that she was living on principal, rather than on dividends and profits from her stock. The mere fact that she received confirmation slips and monthly and quarterly statements from Bateman Eichler did not give rise to a duty on her part to make inquiry regarding the status of her account.

Further, the accountant's knowledge of Mrs. Hobbs' securities transactions, which was obtained in preparing her tax returns for the years 1976, 1977 and 1978, cannot be imputed to her by operation of law. If anything,

the evidence in this case indicates that Mr. Cleary, who was Ravenscroft's accountant, social friend and client, was derelict in his duty to Mrs. Hobbs. He never advised Mrs. Hobbs, even after 1978, that there might be problems in her dealings with appellants. Certainly, under the unique circumstances of this case, any knowledge which Mr. Cleary may have had in regard to appellants' breach of their fiduciary responsibilities to Mrs. Hobbs is not chargeable to her.

We hold, therefore, that Mrs. Hobbs' action is not barred by limitations.

Appellants point to essentially the same facts in urging that the doctrines of waiver and estoppel bar this lawsuit. They argue that since 1975 Mrs. Hobbs had both actual and constructive knowledge of the facts underlying her claim. We disagree. The principles enunciated above, with respect to appellants' limitations defense, are equally applicable here.

Under these principles, the earliest time at which it could even be argued that Mrs. Hobbs was aware of facts which would have put her on notice of Ravenscroft's breach of fiduciary duty would be April of 1980. It was only after speaking with Ravenscroft that Mrs. Hobbs discovered she could not afford to purchase a condominium or land in Santa Fe. Right after those distressing conversations, her son, Mr. Wrightsman, telephoned Ravenscroft and asked him if his mother had been living on principal, rather than dividends and profit from her stock. Ravenscroft admitted as much and stated that he had been remiss in not advising her of that fact earlier.

It was only then that Mrs. Hobbs became concerned. By the early part of 1981, she closed her account, discovered only $2,500 was left in it, and by June of 1981 she had already consulted an attorney and had filed the instant action. On these facts it cannot be said that Mrs. Hobbs' action was barred by principles of waiver or estoppel.

Appellants urge, however, that Mrs. Hobbs' action was in fact barred by the doctrines of waiver and estoppel because she signed eleven happiness letters and returned them to Bateman Eichler, leading them to conclude that she understood the status of her account and was very satisfied with their services.

We cannot agree with appellants' assessment of the effect of those form letters. Should we allow Mrs. Hobbs' action to be barred as a matter of law

because in her naivete she signed and returned form letters which 75 percent of the recipients of the letters simply ignored, we would do her and other innocents similarly situated a gross injustice. Dr. Teweles testified that the happiness letters are known in the trade as "suicide letters." They are so known because by signing them clients give brokerage houses a "foot in the door" to claim the client acquiesced in or ratified all of the transactions in his or her account until that point in time.

The jury, which was properly instructed on the relevant law, did not believe Mrs. Hobbs' actions, or lack thereof, had worked as either a waiver or an estoppel with respect to her right to bring this lawsuit against appellants. Substantial evidence supports their conclusion on these questions. Therefore, we hold that Mrs. Hobbs did not waive and was not estopped from asserting her claims against appellants for breach of their fiduciary duties to her.

## CONCLUSION

The supreme irony in this case is that Ravenscroft testified he told Mrs. Hobbs that her stated objectives would have to change because he could not generate $15,000 a year income for her on an $80,000 portfolio. Yet Ravenscroft did exactly that for Bateman Eichler, generating a $15,000 a year income in commissions. This is a classic example of the conflict of interest which exists in the securities industry and is at the heart of the circumstances which resulted in the "hobbling" of Mrs. Hobbs. On the one hand, brokers act as investment advisors to their clients. On the other hand, they are salespersons, dependent upon their brokerage commissions for a livelihood. Commissions are received only when customers engage in transactions. Individual brokers employed by a brokerage firm normally obtain as their sole compensation between 30 and 40 percent of the commissions they produce.

"Under this compensation system, 'few brokers are immune to the temptation to consider their financial interest from time to time while they are advising clients. Being at once a salesman and a counselor is too much of a burden for most mortals.'" (Poser, *Options Account Fraud: Securities Churning in a New Context* (1984) 39 Bus. Law. 571, 573 (hereinafter cited as *Securities Churning*); see also Mundheim, *Professional Responsibilities of Broker-Dealers: The Suitability Doctrine* (1965) Duke L.J. 445, 447.)

Sadly, the Securities and Exchange Commission, while prosecuting numerous churning cases, has not seen its way to correct the abuse. (See *Securities Churning, supra,* at p. 574.) Under these circumstances, it is our view that the imposition of substantial punitive damages against a predatory broker will serve to curb the appetite of others similarly inclined.

## DISPOSITION

The judgment and orders are affirmed.

Danielson, J., concurred.

Lui, Acting P. J., concurred in the judgment.

A petition for a rehearing was denied February 20, 1985, and appellants' petition for a hearing by the Supreme Court was denied May 1, 1985.