Filed 6/19/17 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CRST, INC. et al., | B280270 |
| Petitioners, | (Los Angeles County Super. Ct. No. MC025288) |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | ORDER MODIFYING OPINION |
| Respondent; | |
| MATTHEW JOHN LENNIG et al., | [NO CHANGE IN JUDGMENT] |
| Real Party in Interest. | |

THE COURT:*

It is ordered that the opinion filed herein on May 26, 2017 be modified as follows:

On page 21, lines 7 and 8, delete the sentence "According to Davis, on one occasion, Contreras was cited for failing to wear a seat belt."

On page 28, lines 12 and 13, delete the phrase "for failing to wear a seat belt"

On page 28, lines 17 and 18, delete the phrase  "for failing to wear a seat belt"

On page 28, line 20, delete "seatbelt" and substitute "seatbelt-related"

On page 28, line 23, delete "would" and substitute "or a seatbelt-related violation could"

The modification does not change the judgment.

_____
*WILLHITE, Acting P. J.,          MANELLA, J.          COLLINS, J.

2

Filed 5/26/17 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CRST, INC., et al., | B280270 |
| Petitioners, | (Los Angeles County Super. Ct. No. MC025288) |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| MATTHEW JOHN LENNIG et al., | |
| Real Parties in Interest. | |

ORIGINAL PROCEEDINGS in mandate.  Bryan C. Yep, Judge.  Petition granted.

Bassl, Edlin, Huie & Blum, Fred M. Blum, Michael E. Gallagher and Lisa M. Stevenson; Greines, Martin, Stein & Richland, Robert A. Olson, Cynthia E. Tobisman and Alan

Diamond; Yoka & Smith, Christopher E. Faenza and Benjamin A. Davis for Petitioners.

Parris Law Firm, R. Rex Parris, Bruce L. Schechter and Khail A. Parris; Grignon Law Firm, Margaret M. Grignon and Anne M. Grignon for Real Parties In Interest.

_____

This case arises from a vehicular accident in which a freightliner driven by petitioners' employee struck a vehicle, causing serious injuries to the passengers, real parties in interest Matthew and Michael Lennig. The Lennigs brought negligence claims against the employee and petitioners and sought punitive damages. After admitting vicarious liability for any negligence by their employee, petitioners sought summary adjudication on claims against them for negligent hiring and entrustment, contending that under *Diaz v. Carcamo* (2011) 51 Cal.4th 1148 (*Diaz*), their acknowledgment of vicarious liability barred such claims. Additionally, both petitioners and the employee sought summary adjudication on the requests for punitive damages. The trial court granted summary adjudication in favor of the employee as to the request for punitive damages against him, but denied petitioners' motion for summary adjudication in its entirety.

Petitioners sought writ relief, challenging the trial court's denial of summary adjudication only as to the Lennigs' requests for punitive damages. We conclude that petitioners' admission of vicarious liability does not bar

recovery of punitive damages, but further conclude there are no triable issues of fact which, if resolved in the Lennigs' favor, could subject petitioners to punitive damages. Accordingly, we grant the petition for writ of mandate.


## FACTUAL AND PROCEDURAL BACKGROUND

In 2014, Hector Contreras was employed as a truck driver by petitioners CRST, Inc., CRST Expedited, Inc., CRST Van Expedited, Inc., and CRST Lincoln Sales, Inc. (CRST). On July 7, 2014, he drove a CRST freightliner on the Interstate 14 freeway. As he passed through a construction area known as the Red Rock Canyon Bridge project, he collided with a car containing Matthew and Michael Lennig. Following the accident, CRST terminated Contreras.

In March 2015, the Lennigs initiated the underlying personal action. Their third amended complaint (TAC), filed July 5, 2016, contained claims for negligence and loss of consortium against Contreras, CRST, and other defendants. Of those claims, only the following are pertinent here: the first cause of action against Contreras and CRST for negligent operation of a motor vehicle; the fourth cause of action against CRST for negligent hiring, supervision, and retention; the fifth cause of action against Contreras for negligent infliction of emotional distress; and the seventh

cause of action against CRST for negligent entrustment.[1] Each claim included a request for punitive damages.

Contreras sought summary adjudication on the request for punitive damages accompanying the first and fifth causes of action, and CRST separately sought summary adjudication on the fourth and seventh causes of action and the requests for punitive damages accompanying the first, fourth, and seventh causes of action. Contreras contended the requests for punitive damages against him failed for want of evidence to support the TAC's key allegation regarding those requests, namely, that he was intoxicated when the collision occurred. CRST maintained that under *Diaz*, the fourth and seventh causes of action should be dismissed because CRST admitted vicarious liability for any negligent driving by Contreras. CRST also challenged the requests for punitive damages, arguing that its conduct did not meet the standards for an award of punitive damages, as set forth in Civil Code section 3294.[2]

The trial court granted summary adjudication in Contreras's favor, concluding that no triable issues existed whether he was under the influence of drugs or alcohol at the time of the collision, but denied CRST's motion for summary adjudication in its entirety. On January 23, 2017, CRST filed its petition for writ of mandate, prohibition, or

---

[1] The first, fourth, and seventh causes of action were asserted by Matthew and Michael Lennig, and the fifth cause of action was asserted by Michael Lennig.

[2] All further statutory citations are to the Civil Code.

4

other relief, challenging the trial court's denial of summary adjudication only as to the requests for punitive damages. We issued an alternative writ of mandate directing the court's and parties' attention to *Diaz*, and imposed a temporary stay.

## DISCUSSION

CRST contends the trial court erred in denying summary adjudication on the requests for punitive damages against it accompanying the first, fourth, and seventh causes of action. CRST asserts (1) that *Diaz* bars the recovery of punitive damages in view of CRST's acceptance of vicarious liability, and (2) that there are no triable issues regarding the propriety of an award of punitive damages under section 3294. As explained below, we reject CRST's contention regarding *Diaz*, but agree with its second contention.

### A. *Standard of Review*

"An order denying a motion for summary adjudication may be reviewed by way of a petition for writ of mandate. [Citation.] Where the trial court's denial of a motion for summary judgment will result in trial on non-actionable claims, a writ of mandate will issue. [Citations.] Likewise, a writ of mandate may issue to prevent trial of non-actionable claims after the erroneous denial of a motion for summary adjudication. [¶] Since a motion for summary judgment or summary adjudication 'involves pure matters of law,' we review a ruling on the motion de novo to determine

whether the moving and opposing papers show a triable issue of material fact. [Citations.] Thus, the appellate court need not defer to the trial court's decision. "'We are not bound by the trial court's stated reasons, if any, supporting its ruling; we review the ruling, not its rationale.'"[3] [Citations.]" (*Travelers Casualty & Surety Co. v. Superior Court* (1998) 63 Cal.App.4th 1440, 1450.)

B.  *Governing Principles*

Because the key issues before us concern the extent to which CRST's admission of vicarious liability shields it from an award of punitive damages, we examine the principles governing an employer's vicarious liability for damages. Under the doctrine of respondeat superior, "an employer is vicariously liable for the torts of its employees committed within the scope of the employment." (*Lisa M. v. Henry Mayo Newhall Memorial Hospital* (1995) 12 Cal.4th 291, 296.) The employer is thus liable for the compensatory damages attributable to the employee's misconduct, even when the employer is "innocent" of fault. (*Miller v. Stouffer* (1992) 9 Cal.App.4th 70, 84, italics

---

[3]  The parties asserted numerous objections to each other's evidentiary showing. Because the trial court denied some objections but did not expressly rule on the remaining ones, we presume all to have been overruled. (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 534 (*Reid*).) As neither side has resurrected their objections before us, we examine the trial court's rulings in light of the entire body of evidence submitted in connection with CRST's motion for summary adjudication.

omitted.) The rationale for the doctrine closely parallels the justification for imposing strict products liability on nonnegligent product manufacturers. (*Far West Financial Corp. v. D & S Co.* (1988) 46 Cal.3d 796, 813, fn. 13.) As our Supreme Court has explained, "'[t]he losses caused by the torts of employees, which as a practical matter are sure to occur in the conduct of the employer's enterprise, are placed upon that enterprise itself, as a required cost of doing business.'" (*Ibid.,* quoting Prosser & Keeton on Torts (1984) § 69, p. 500 [fns. omitted].)

The special features of vicarious liability determine the employer's share of liability for compensatory damages under the comparative fault system, which allocates liability for tort damages in direct proportion to fault.[4] (*Diaz, supra,* 51 Cal.4th at pp. 1152, 1156.) As noted above, the respondeat superior doctrine attributes liability for compensatory damages to an employer, independent of

---

[4] The comparative fault doctrine "is designed to permit the trier of fact to consider all relevant criteria in apportioning liability. The doctrine 'is a flexible, commonsense concept, under which a jury properly may consider and evaluate the relative responsibility of various parties for an injury (whether their responsibility for the injury rests on negligence, strict liability, or other theories of responsibility), in order to arrive at an "equitable apportionment or allocation of loss."' [Citation.]" (*Rosh v. Cave Imaging Systems, Inc.* (1994) 26 Cal.App.4th 1225, 1233, quoting *Knight v. Jewett* (1992) 3 Cal.4th 296, 314.) A defendant has the burden of showing that some nonzero percentage of fault is properly attributed to the plaintiff or an individual other than the defendant. (See *Sparks v. Owens-Illinois, Inc.* (1995) 32 Cal.App.4th 461, 476.)

7

any fault on the employer's part.  Accordingly, within the comparative fault system, when an employer is liable solely on a theory of respondeat superior, "the employer's share of liability for the plaintiff"s damages corresponds to the share of fault that the jury allocates to the employee." (*Id.* at p. 1157.)

In contrast, under the respondeat superior doctrine, the employer is not liable for punitive damages absent fault or misconduct on the employer's part.  (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 724, fn. 11 (*College Hospital*); *Weeks v. Baker & Mckenzie* (1998) 63 Cal.App.4th 1128, 1155 (*Weeks*); *Merlo v. Standard Life & Acc. Ins. Co.* (1976) 59 Cal.App.3d 8, 18 (*Merlo*).)  Unlike compensatory damages, which seek to make the plaintiff whole, punitive damages are intended to deter general types of misconduct.  (*College Hospital*, *supra*, 8 Cal.4th at p. 712.)  California courts have long held that punitive damages may, under appropriate circumstances, be recoverable for nondeliberate or unintentional torts, including actions in which the theory of recovery for compensatory damages from the defendant is based on strict products liability (*Grimshaw v. Ford Motor Co.* (1981) 119 Cal.App.3d 757, 810 (*Grimshaw*)) or vicarious liability (see *Merlo, supra,* 59 Cal.App.3d at p. 18). Accordingly, upon a suitable demonstration of employer misconduct, a vicariously liable employer may be subject to an award of punitive damages when an employee was negligent.  (*Farvour v. Geltis* (1949) 91 Cal.App.2d 603,

8

604-606; see *Nolin v. National Convenience Stores, Inc.* (1979) 95 Cal.App.3d 279, 284-289.)

The standard of misconduct for the recovery of punitive damages from a vicariously liable employer has been refined and modified. (See *Weeks*, *supra*, 63 Cal.App.4th at pp. 1148-1149.) Prior to the enactment of the current version of section 3294, California courts followed the rule stated in the Restatement of Torts section 909, which permits the imposition of punitive damages on an employer in several circumstances, including when ""the [employee] was unfit and the [employer] was reckless in employing him . . . .""""[5] (*Weeks*, *supra*, 63 Cal.App.4th at pp. 1148-1149; *Merlo*, *supra*, 59 Cal.App.3d at p. 18; see *College Hospital*, *supra*, 8 Cal.4th at p. 723.)

The requisite employer misconduct is now specified in subdivision (b) of section 3294, which states that an employer may be liable for punitive damages when "'the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are

---

[5]     Restatement of Torts section 909 states: "Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if, [¶] (a) the principal authorized the doing and the manner of the act, or [¶] (b) the agent was unfit and the principal was reckless in employing him, or [¶] (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or [¶] (d) the employer or a manager of the employer ratified or approved the act."

9

awarded or was personally guilty of oppression, fraud, or malice . . . .'" (*Weeks, supra*, 63 Cal.App.4th at p. 1148.) The statute further provides that "'[w]ith respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation.'" (*Ibid.*) An award of punitive damages under the statute must be supported by findings made on clear and convincing evidence. (*Barton v. Alexander Hamilton Life Ins. Co. of America* (2003) 110 Cal.App.4th 1640, 1644.)

### C. Diaz *does not bar the recovery of punitive damages*

We begin with the issue to which we directed the parties' attention, viz., whether under *Diaz*, CRST's admission of vicarious liability precludes the recovery of punitive damages against it.[6] Because the material facts here are undisputed, the key issues before us concern the application of *Diaz* to section 3294, subdivision (b).

In *Diaz*, the Supreme Court's focus was on a rule set forth in *Armenta v. Churchill* (1954) 42 Cal.2d 448 (*Armenta*), which was decided before the adoption of the comparative fault system. *Armenta* involved a wrongful death action in which the plaintiff sought compensatory

---

[6] Petitioners do not challenge the trial court's denial of summary adjudication on the claims for negligent hiring and entrustment. Application of *Diaz* to those claims is therefore not before us.

10

damages from the driver of a dump truck and its owner, alleging that her husband died when the dump truck backed over him. (*Id.* at p. 451.) The plaintiff asserted a claim for negligence against the driver and a claim for negligent entrustment against the owner based on allegations that she knew the driver had a poor driving record. (*Id.* at p. 456.) After the defendants admitted that the driver was acting within the scope of his employment at the time of the accident, the trial court barred the plaintiff from introducing evidence at trial regarding the owner's knowledge of the driver's driving record. (*Ibid.*) Affirming that ruling, our Supreme Court explained that the complaint's allegations merely asserted two alternative theories -- namely, negligence and vicarious liability -- under which the plaintiff "sought to impose upon [the owner] the same liability as might be imposed upon [the driver]." (*Id.* at p. 457.) Because the owner's admission of vicarious liability established her liability for the driver's tort, "there was no material issue remaining to which the offered evidence could be legitimately directed." (*Id.* at pp. 457-458.)

  *Diaz* examined whether the *Armenta* rule survived adoption of the comparative fault system. In *Diaz*, the plaintiff was injured when the car she was driving collided with another passenger vehicle and a commercial truck. (*Diaz*, *supra*, 51 Cal.4th at pp. 1152-1153.) In addition to asserting negligence claims against the drivers of the passenger vehicle and truck, she alleged that the truck's owner was vicariously liable for the driver's negligence and

11

directly liable for its own negligence in hiring and retaining him.  (*Ibid.*)  Notwithstanding *Armenta*, the trial court permitted the plaintiff to introduce evidence of the driver's poor employment and driving record, even though the owner admitted vicarious liability for any negligence by the driver.  (*Id.* at p. 1153.)  A jury returned verdicts in the plaintiff's favor, including her claims against the owner for negligent hiring and retention, and allocated different shares of liability for compensatory damages among the three defendants.  (*Ibid.*) The Court of Appeal affirmed the judgment, concluding that the adoption of the comparative fault system vitiated *Armenta*.  (*Id.* at p. 1154.)

Reversing the judgment of the Court of Appeal, our Supreme Court reaffirmed *Armenta*.  (*Diaz*, *supra*, 51 Cal.4th at pp. 1154-1161.)  The court determined that within the context of the comparative fault system, when the plaintiff alleges that an employee engaged in negligent driving, and seeks damages from the employer on the basis of vicarious liability and claims of negligent hiring, retention, or entrustment, the employer's share of liability is necessarily coextensive with that of the employee.  (*Ibid.*)  Accordingly, "[i]f . . . an employer offers to admit vicarious liability for its employee's negligent driving, then claims against the employer based on theories of negligent entrustment, hiring, or retention become superfluous.  To allow such claims in that situation would subject the employer to a share of fault *in addition to* the share of fault assigned to the employee, for which the employer has already accepted liability."  (*Id.* at p. 1160.)  The court thus

12

restated and endorsed the *Armenta* rule, which it characterized as "bar[ring]" a claim for negligent entrustment when the employer admits vicarious liability for an employee's negligent conduct. (*Id.* at p. 1158.)

As noted, petitioners have not challenged the trial court's denial of summary adjudication on the claims for negligent entrustment and retention. The issue before us is whether, under *Diaz*, petitioners' admission of vicarious liability bars the recovery of punitive damages. We conclude it does not. *Diaz* and *Armenta* establish that when an employer admits vicarious liability, the plaintiff may seek compensatory damages from the employer *only* on a theory of vicarious liability. Because neither *Diaz* nor *Armenta* addressed an action in which punitive damages were sought, in each case the employer's admission of vicarious liability necessarily rendered superfluous any allegations or evidence bearing on the employer's own misconduct.

That is not the case, however, when the plaintiff seeks compensatory damages from the employer on a theory of vicarious liability, and also requests punitive damages from the employer. As explained above (see pt. B. of the Discussion, *ante*), under the theory of vicarious liability, the employer may be subject to punitive damages upon a proper showing of misconduct, the standards for which are specified in section 3294, subdivision (b). Allegations in the complaint relating to that misconduct do not constitute a separate cause of action, but attach to the claim for recovery

13

against the employer under the theory of vicarious liability.[7] (See *Coleman v. Gulf Ins. Group* (1986) 41 Cal.3d 782, 789, fn. 2. ["[T]here is no separate or independent cause of action for punitive damages"]; *McLaughlin v. National Union Fire Ins. Co.* (1994) 23 Cal.App.4th 1132, 1163 ["In California there is no separate cause of action for punitive damages"].) Thus, when an employer such as CRST admits vicarious liability, neither the complaint's allegations of employer misconduct relating to the recovery of punitive damages nor the evidence supporting those allegations are superfluous. Nothing in *Diaz* or *Armenta* suggests otherwise.

CRST directs our attention to *Ferrer v. Okbamicael* (Colo. 2017) 390 P.3d 836, 847-848, in which the Colorado Supreme Court adopted a rule similar to that stated in *Diaz* and *Armenta*, and further concluded that under Colorado law, the rule barred the recovery of punitive damages from the employer admitting vicarious liability. *Ferrer* is distinguishable, however, because the Colorado statute governing punitive damages, unlike section 3294, contains no provision authorizing an award of punitive damages

---

[7]     As our Supreme Court has explained, the pleading requirements for such a claim are minimal: "'In order to state a cause of action against defendant for a wrong committed by his servant, the ultimate fact necessary to be alleged is that the wrongful act was in legal effect committed by defendant. This may be alleged either by alleging that defendant by his servant committed the act, or, without noticing the servant, by alleging that defendant committed the act.'" (*Golceff v. Sugarman* (1950) 36 Cal.2d 152, 154, quoting 57 C.J.S. 386.)

against an employer responsible for compensatory damages on a theory of vicarious liability.[8]

CRST also suggests that extending the *Diaz-Armenta* rule to bar the recovery of punitive damages from an employer admitting vicarious liability would promote beneficial public policies, arguing that such a rule would encourage employers to admit vicarious liability. We disagree. In *Grimshaw*, the court concluded that considerations of public policy support the recovery of punitive damages from manufacturers of defective products under a theory of strict products liability, which rests on a justification similar to that underlying the doctrine of respondeat superior. (*Grimshaw*, *supra*, 119 Cal.App.3d at p. 810.) Absent such a rule, the court stated, "in commerce-related torts, the manufacturer may find it more profitable to treat compensatory damages as part of the cost of doing business rather than to remedy the [product's] defect." (*Ibid*.) That rationale applies here as well. If the *Diaz-Armenta* rule were extended in the manner CRST suggests, employers indifferent to public safety might find it more

---

8    Colorado Revised Statutes Annotated section 13-21-102(1)(a) provides: "In all civil actions in which damages are assessed by a jury for a wrong done to the person or to personal or real property, and the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct, the jury, in addition to the actual damages sustained by such party, may award him reasonable exemplary damages. The amount of such reasonable exemplary damages shall not exceed an amount which is equal to the amount of the actual damages awarded to the injured party."

15

profitable to admit vicarious liability when sued, and treat any resulting compensatory damages as part of the cost of doing business, rather than remedy practices that enable them to employ unsafe drivers. In sum, we conclude CRST's admission of vicarious liability did not bar the Lennigs' requests for punitive damages.

D. *There are no triable issues under section 3294, subdivision (b)*

We turn to CRST's remaining contention, namely, that it is not properly subject to punitive damages under the standards set forth in section 3294, subdivision (b).

1. *TAC's Allegations*

In assessing the trial court's ruling, we look first to the allegations in the TAC, which frame the issues pertinent to CRST's motion for summary adjudication. (*Bostrom v. County of San Bernardino* (1995) 35 Cal.App.4th 1654, 1662.) However, we disregard the TAC's allegations that Contreras was potentially intoxicated at the time of the accident, as the trial court determined there was insufficient evidence to support those allegations in granting Contreras's motion for summary adjudication. Although the Lennigs, in opposing CRST's petition, suggest that the accident was due to Contreras's intoxication, they did not seek review of the ruling on the motion by Contreras, who -- though nominally a real party in interest in this proceeding -- has not appeared or filed a brief. We therefore decline to examine the trial court's determination regarding Contreras's lack of

16

intoxication. (*Transworld Systems, Inc. v. County of Sonoma* (2000) 78 Cal.App.4th 713, 716, fn. 4 [in appeal from grant of summary judgment, respondents' failure to take cross-appeal from a related unfavorable ruling forfeited its challenge to that ruling]; *Campbell v. Superior Court* (2005) 132 Cal.App.4th 904, 922 [in writ petition proceeding regarding specific ruling, real party's failure to seek review of related unfavorable ruling precluded attack on that ruling].)

The TAC alleges that CRST communicates to its employees and the public that "its single greatest priority" is "the safety of its drivers and the public." CRST has thus implemented certain safety policies, including background checks of prospective employees. To discharge the duty of conducting those checks -- which the TAC characterizes as nondelegable -- CRST hired a third party company to investigate prospective employees.

According to the TAC, the third party company failed to conduct an adequate check of Contreras's criminal record. Furthermore, although it discovered that Contreras had suffered a conviction for a misdemeanor or felony within seven years of his employment application, CRST did not exercise due diligence in investigating the conviction. In addition, in violation of a CRST policy mandated by federal law, CRST allegedly failed to make inquiries to Contreras's former employers regarding his drug and alcohol use. Had CRST done so, it would have discovered that Contreras had a criminal history, including multiple convictions for the possession and use of illegal substances, a conviction for

17

driving under the influence of an intoxicating substance, and a conviction for grand theft of an automobile.

The TAC further alleges that under federal regulations, employers must test a specified minimum percentage of drivers per year for the use of drugs and alcohol. However, CRST failed to implement a random drug testing policy.

According to the TAC, on December 5, 2013, CRST hired Contreras as a driver. Between that date and the July 7, 2014 accident involving the Lennigs, Contreras caused four preventable accidents, two of which occurred between June 26 and July 3, 2014. Marge Davis and Dale Stanek -- whom the TAC characterizes as "managing agents" for CRST -- responded to the accidents by requiring Contreras to take a driving course.

Within the two-month period preceding the July 7, 2014 accident involving the Lennigs, Richard Oliver III, Contreras's co-driver, allegedly told Davis that police officers had stopped Contreras for tailgating and speeding in a construction zone. Although CRST has a policy of terminating drivers who speed or compelling them to undergo driver education, Davis took no action against Contreras.

Some or all of CRST's trucks have a "Qualcomm" system, which permits CRST's dispatchers to communicate with the trucks. As early as June 25, 2014, Davis allegedly knew that the Qualcomm system in Contreras's truck was not functioning, but she permitted Contreras to continue driving the truck.

Under CRST's policies, probationary drivers such as Contreras must be accompanied by a co-driver. Commencing on July 3, 2014, Davis allowed Contreras to operate his truck alone during a 370-mile trip from San Rafael to Lancaster, and further permitted him to have sole possession of the truck over the July 4 weekend. According to the TAC, on July 3, Davis and Stanek received a notification from an electronic module in the truck that it was travelling at 99 miles per hour, but took no action. The following day, the module informed Davis that Contreras had driven the truck from Lancaster to a lake. Davis did not contact Contreras regarding his use of the truck.

Finally, the TAC alleges that on July 7, 2014, while travelling south through the Red Rock Bridge Project construction area, Contreras's truck crossed over into a lane for northbound traffic, and hit the car containing Matthew and Michael Lennig.

### 2. *CRST's Showing*

In seeking summary judgment, CRST's motion denied that Davis and Stanek were managing agents within the meaning of section 3294, subdivision (b). According to CRST, during the pertinent period, Davis was a fleet manager responsible for dispatching and tracking trucks, and Stanek was a safety supervisor responsible for investigating accidents and resolving safety issues with drivers.

CRST submitted evidence supporting the following version of the underlying events: Contreras's employment

19

application stated that he had no license suspensions, felony convictions, or convictions or accidents involving substance abuse. Under federal regulations, CRST was required to investigate Contreras's driving records and history of drug and alcohol use for a three-year period preceding his application. (49 C.F.R. § 391.23 (2016).) The regulations permitted CRST to hire a third party to conduct the investigation. In November 2013, a third party company informed CRST that it found that Contreras had had a valid driver's license since 2005, that his driving record showed no traffic violations or convictions after the license was issued, and that he had no record of a criminal conviction within the previous seven years.

During the pertinent period, CRST complied with all federal regulations regarding the testing of its drivers for drug and alcohol use. Before hiring Contreras, CRST required him to submit to drug and alcohol screening. He tested negatively for drugs and alcohol.

Under CRST's policies, after a driver completes a 28-day training course and acquires certain certifications, the driver is classified as a "co-driver." Ordinarily, co-drivers are paired into two-person teams, but they are permitted to drive alone unless assigned to a "high valued freight load." After CRST hired Contreras, he successfully completed his training in January 2014 and was placed on a co-driver team.

Prior to the July 7, 2014 accident involving the Lennigs, Contreras was involved in two minor preventable accidents. Those accidents occurred in January 2014, on

20

occasions when he backed up his truck. As a result of the accidents, CRST required Contreras to complete additional driver training.

Davis testified that prior to the July 7, 2014 accident, she received no complaint from Oliver that Contreras had been stopped for driving at an excessive speed through a construction area. According to Davis, on one occasion, Contreras was cited for failing to wear a seat belt. She further testified that had police officers stopped Contreras for speeding, they would have issued a speeding citation to him, and CRST would have terminated him.

From June 25, 2014 to the date of the accident involving the Lennigs, Contreras's truck had a working Qualcomm unit. On July 3, 2014, Contreras used the Qualcomm unit to inform CRST that he would be on "home time" until July 7, and he retained possession of a CRST tractor during that period. CRST submitted evidence that on July 3, the electronic module in Contreras's truck did not indicate that it was travelling at 99 miles per hour; rather, the annotation "MPH 99" in the truck's "[l]oad [h]istory" for that date was a default code that the load would not be delivered on time.[9]

On July 7, 2014, Contreras was driving to the CRST Riverside Terminal in the CRST tractor when he collided with the Lennigs' car. At that time, he was acting within

_____

[9] CRST also submitted evidence that following the July 7, 2014 accident, CRST complied with federal rules regarding post-accident testing of drivers.

the scope and course of his employment. Following the accident, CRST complied with federal rules regarding post-accident testing of drivers.

### 3. *The Lennigs' Showing*

In opposing summary adjudication, the Lennigs did not dispute numerous items in CRST's separate statement of undisputed facts, including that CRST complied with federal rules regarding drug and alcohol testing, and that in hiring Contreras, CRST complied with federal regulations regarding pre-employment screening.[10] However, they offered testimony from Charles Haffenden (designated by CRST as its "person most knowledgeable") that in or after 2011, CRST, like all other freight carriers, lowered its standards for hiring truck drivers.

According to the Lennigs' showing, from 1981 to 1989, the City of Los Angeles employed Contreras as a garbage truck driver. He was fired from that position because he

---

[10] The Lennigs attempted to challenge some items in CRST's separate statement of undisputed facts by asserting evidentiary objections to CRST's showing. Because the trial court did not rule on the objections, they were effectively overruled. (*Reid, supra*, 50 Cal.4th at p. 534) As the Lennigs do not challenge those evidentiary rulings before us, we view the pertinent items in CRST's separate statement as undisputed for purposes of our analysis. (*Wall Street Network, Ltd. v. New York Times Co.* (2008) 164 Cal.App.4th 1171, 1181 [appellant's failure to address trial court's evidentiary rulings in connection with summary judgment forfeited contentions of error on appeal regarding rulings].)

began to use drugs heavily. From May 1995 to February 2007, Contreras suffer convictions for numerous offenses, including possession of illegal substances and paraphernalia and driving under the influence of an intoxicating substance. In applying for employment with CRST, Contreras falsely denied the existence of his criminal record, traffic offenses, and history of substance abuse.

The Lennigs submitted evidence that CRST contravened its safety policies in permitting Contreras to drive their trucks. CRST allowed Contreras to drive his truck without a co-driver, even though his personnel record contained the notation, "co-drive until 11/28/14." Furthermore, CRST violated its policy that a driver should be terminated for a serious traffic violation or for causing six preventable accidents within an eight-month period.

According to the Lennigs' showing, approximately two weeks before the July 7, 2014 accident involving the Lennigs, Contreras drove through a construction zone, accompanied by Oliver, and was issued a ticket. Oliver testified that although Contreras was tailgating and speeding, the officer issued a ticket only for a seatbelt violation.[11] Oliver reported the incident to Davis, who took no action against Contreras. Additionally, the Lennigs maintained the existence of another speeding incident, contending that the truck's "load history," as generated by

---

[11] According to Oliver, the officer saw Oliver transfer from the passenger seat to the truck's sleeper unit while the truck was moving, and issued a citation to Contreras for Oliver's failure to wear a seat belt.

the Qualcomm unit, showed on its face that the truck travelled at 99 miles per hour on July 3, 2014.[12]

The Lennigs further asserted that during the eight months preceding the July 7, 2014 accident, Contreras was involved in four preventable accidents. Aside from the two accidents admitted by CRST, Oliver testified that in the course of a road trip during which he acted as Contreras's co-driver, Contreras caused two other accidents, although Oliver did not describe them.[13] CRST's records for Contreras contain the following remarks following the July 7, 2014, accident: "[Contreras] was on hometime and drove the truck unauthorized and got into a accident. His accident record shows prior accident[s] ." The records list four prior accidents, although one is accompanied by the annotation, "hit by other vehicle."

In an effort to show that Stanek was aware that Contreras was an unsafe driver prior to the July 7, 2014 accident, the Lennigs offered evidence that following the accident, Davis and Stanek discussed Contreras in e-mails. In an e-mail dated July 21, 2014, Stanek told Davis that he was attempting to obtain a copy of the police report

---

[12]  Notwithstanding the TAC's allegation to the contrary, the Lennigs acknowledged that from June 25 to July 7, 2014, Contreras's truck had an operational Qualcomm unit.

[13]  In addition to this showing, the Lennigs offered evidence regarding facts not directly relevant to Contreras's driving, including that he was homeless when hired and at the time of the July 7, 2014 accident, and that he used marijuana shortly before his deposition in the underlying action.

regarding the accident through an adjuster, stating, "Hector's record is questionable. If the report comes back unfavorable, this will be his third accident in six months." Later, on August 6, 2014, Stanek informed Davis that he had not heard from the adjuster, and stated: "As I mentioned before, Hector has had other accidents. He seemed unsure who hit who in this accident. Given his accident record, I feel there is a reasonable chance Hector is at fault in the last accident."

The Lennigs also maintained that Davis and Stanek were managing agents within the meaning of section 3294, subdivision (b). According to the Lennigs' showing, Davis supervised as many as 100 drivers, oversaw their freight-related activities, ensured that they maintained their qualifications and trucks, authorized their "home time" and truck use, and interacted with safety supervisors such as Stanek. Contreras and Oliver viewed her as their "boss" or "immediate supervisor." When necessary, she terminated drivers for unsafe driving. Stanek supervised CRST staff regarding compliance with federal safety regulations and the prevention of future accidents.

### 4. *Analysis*

We conclude that there are no triable issues whether CRST is properly subject to punitive damages under the standards specified in section 3294, subdivision (b). As explained below, although the record does not suggest that CRST authorized or ratified Contreras's misconduct or "personally" engaged in oppression, fraud, or malice, it

25

raises triable issues whether Davis -- but not Stanek -- "had advance knowledge of . . . [Contreras's] . . . unfitness . . . and employed him . . . with a conscious disregard of the rights or safety of others . . . ." (§ 3294, subd. (b).) Nonetheless, there is no evidence that Davis was a "managing agent," for purposes of section 3294, subdivision (b).

### a. *"Advance Knowledge" and "Conscious Disregard"*

In evaluating the existence of the requisite "advance knowledge" and "conscious disregard," our focus is on the period of Contreras's employment by CRST. Although Contreras had a lengthy record of substance abuse, poor driving, and criminal activity up to 2007, it is undisputed that CRST complied with federal regulations in conducting the pre-employment background check and did not discover those facts regarding Contreras. We therefore examine whether CRST acquired knowledge of Contreras's unfitness as a driver after he was hired, yet improperly continued to employ him.

We assess CRST's "advance knowledge" and "conscious disregard" in light of its policies, which required the termination of a driver for serious traffic violations or causing six preventable accidents within an eight-month period.[14] In view of these policies, CRST did not act

---

[14] In making this assessment, we recognize that CRST allowed Contreras to drive a tractor by himself on July 7, 2014, even though his personnel file contained the notation "co-drive until 11/28/14." However, in view of the unrebutted evidence that

*(Fn. continued on the next page.)*

26

improperly by retaining Contreras, even though he may have been involved in as many as four preventable accidents, because nothing in the record suggests that they were serious.

Nor did the annotation "MPH 99" in the truck's July 3, 2014 load history reasonably show that Contreras was an unsafe driver. That annotation is located on a document entitled "Load History Comment Info," which contains notations and acronyms, none which are defined. Among these are the following:

"4475 TRACKING CODE SET TO 0 RS MPH 33 ON 7/02 AT 07:09 . . . [¶]

4475 TRACKING CODE SET TO 0 RS MPH 32 ON 7/02 AT 14:00 . . . [¶]

4475 TRACKING CODE SET TO 0 RS MPH 99 ON 7/03 AT 06:39 . . ."

As the document itself invites only speculation regarding the meaning of these remarks, the existence of a triable issue hinges on the evidence regarding their meaning. Davis testified that in July 2014, CRST had no method of monitoring the current speed of its trucks. Instead, CRST tracked a truck's "load history," which included a reading -- stated in miles per hour -- of the average speed the truck would have to travel in order to

---

CRST's policies permitted drivers with Contreras's qualifications to drive alone unless assigned to a high-value freight load, we conclude that Contreras's solitary driving creates no material triable issue absent any triable issues relating to the known safety of his driving, which we examine below.

27

deliver its load on time. Thus, a reading of 33 miles per hour in the truck's load history meant that at the time of the reading, the truck was required to travel at that average speed in order to make a timely delivery. CRST also offered evidence that its trucks have governors that cut power when they exceed 65 miles per hour. In opposing summary adjudication, the Lennigs presented no evidence that the load history reflected that Contreras's truck was travelling at 99 miles per hour on July 3. Accordingly, the annotation "MPH 99" cannot reasonably be viewed as evidence that Contreras was an unsafe driver.

The evidence regarding Contreras's traffic citation for failing to wear a seat belt, however, raises triable material issues regarding CRST's "advance knowledge" and "conscious disregard." According to the Lennigs' showing, in mid-June 2014, before the accident involving the Lennigs, Contreras was issued a citation for failing to wear a seat belt. According to Oliver, although Contreras was tailgating and speeding while driving through a construction zone, the officer issued a ticket only for a seatbelt violation. Oliver allegedly reported the incident to Davis. Davis denied hearing any such report from Oliver, but acknowledged that speeding in a construction zone would support a driver's termination. In our view, Oliver's testimony, if credited by a jury, is sufficient to show that CRST had "advance knowledge of [Contreras's] unfitness . . . and employed him . . . with a conscious disregard of the rights or safety of others." (§ 3294, subd. (b).)

28

### b. *Managing Agents*

Because there is no dispute that CRST is a "corporate employer," the remaining issue is whether "the advance knowledge" and "conscious disregard" was by a "managing agent of the corporation." (§ 3294, subd. (b).) Our focus is on Davis and Stanek, the two employees identified as potential "managing agents" in the TAC.[15]

Nothing before us suggests that Stanek had the requisite "advance knowledge" regarding Contreras's lack of fitness. Although the record shows that Stanek was CRST's safety supervisor, it contains no evidence that Stanek was aware of Contreras's driving history prior to the July 7, 2014 accident. The record shows only that in e-mails dated July 21 and August 6, 2014, Stanek described Contreras's driving record as "questionable" due to two prior accidents. In our view, that evidence supports no reasonable inference that Stanek knew of Contreras's "unfitness" prior to the July 7, 2014 accident. (See *College Hospital*, *supra*, 8 Cal.4th at pp. 723-724.)

As triable issues exist regarding Davis's pre-accident knowledge of Contreras's driving, we examine whether she was a managing agent. Generally, "principal liability for punitive damages [does] not depend on employees' managerial level, but on the extent to which they exercise substantial discretionary authority over decisions that ultimately determine corporate policy." (*White v. Ultramar,*

---

[15] Although the Lennigs' return also points to Haffenden as a potential managing agent for CRST, the return identifies no evidence that he was aware of Contreras's driving record before the July 7, 2014.

*Inc.* (1999) 21 Cal.4th 563, 576-577 (*White*).)  Thus, to establish that an individual is a managing agent, a plaintiff seeking punitive damages must show that "the employee exercised substantial discretionary authority over significant aspects of a corporation's business."  (*Id.* at p. 577.)  In this context, "corporate policy" refers to "'formal policies that affect a substantial portion of the company and that are of the type likely to come to the attention of corporate leadership.'"  (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 715; *Cruz v. Homebase* (2000) 83 Cal.App.4th 160, 167-168 ["'corporate policy' is the general principles which guide a corporation, or rules intended to be followed consistently over time in corporate operations," and thus "[a] 'managing agent' is one with substantial authority over decisions that set these general principles and rules"].)

The key inquiry thus concerns the employee's authority to change or establish corporate policy.  (*Myers v. Trendwest Resorts, Inc.* (2007) 148 Cal.App.4th 1403, 1437.)  The fact that an employee has a supervisory position with the power to terminate employees under his or her control does not, by itself, render the employee a managing agent.  (*White, supra*, 21 Cal.4th at pp. 576-577; *Kelly-Zurian v. Wohl Shoe Co.* (1994) 22 Cal.App.4th 397, 421.)  Nor does the fact that an employee supervises a large number of employees necessarily establish that status.  (*Muniz v. United Parcel Service, Inc.* (N.D. Cal. 2010) 731 F.Supp.2d 961, 976 [fact that operations manager was "'in charge of 6 divisions, 23 package centers and approximately 40 managers, 150 supervisors and 4,200 employees'"

insufficient to raise triable issue whether he was managing agent, absent evidence that he set corporate policy].)

The record discloses no evidence that Davis had the requisite authority. As a fleet manager, Davis served under an operations supervisor, and her main responsibility was to dispatch drivers. Davis testified that she managed a fleet of drivers, planned and tracked their freight hauling, resolved their payroll and vacation issues, ensured they maintained their qualifications, and "deal[t] internally" with customer services, the safety department, and "upper management." She oversaw from 48 to 100 drivers, and was authorized to terminate drivers for unsafe driving.

Davis further stated that although she was the "first person in charge of the drivers from a safety standpoint," she interacted with the safety department, which placed "stop[s] on . . . driver[s]," directed them to take defensive driving courses, and ordered random drug and alcohol testing. When she received a complaint from a driver that another driver had been involved in a safety incident, her responsibility was to report the incident to the safety department or "HR." She adjusted the scope of her own investigation on a case-by-case basis, taking into account the gravity of any safety violation. She usually handled "personal issue[s] between one driver and another driver," and forwarded "safety issue[s]" to the safety department. In our view, nothing in this evidence suggests that Davis had discretionary authority sufficiently substantial to influence CRST's corporate policies.

31

The decisions upon which the Lennigs rely are distinguishable, as in each case, the pertinent employee exercised broad discretion capable of setting or influencing corporate policy.[16]  In contrast, there is no evidence here that Davis influenced or set corporate policy.  Accordingly,

---

[16]     Those decisions are:  *White*, *supra*, 21 Cal.4th at p. 577 [supervisor of eight stores with 65 employees was managing agent because her superiors delegated to her "most, if not all, of the responsibility for running [the] stores," and she "ma[de] significant decisions affecting both store and company policy"]; *Powerhouse Motorsports Group, Inc. v. Yamaha Motor Corp., U.S.A.* (2013) 221 Cal.App.4th 867, 886 [regional manager of district encompassing from 140 to 240 car dealerships was managing agent because he was "'ultimately responsible for the total well being'" of the dealerships]; *Davis v. Kiewit Pacific Co.* (2013) 220 Cal.App.4th 358, 366-372 [triable issues existed whether two employees were managing agents, as first was "top onsite manager" charged with wide range of responsibilities for completion of $170 million construction project, and second was main equal employment opportunity officer for entire corporation]; *Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1221 [triable issues existed whether regional manager of claims adjusting firm was managing agent, as she supervised 35 employees who handled claims nationwide, oversaw the claims operation, supervised lower ranking supervisors, trained adjustors, worked on the budget, supervised the handling of certain files, authorized payment of benefits, and directly handled the claim at issue in the action]; *Hobbs v. Bateman Eichler Hill Richards, Inc.* (1985) 164 Cal.App.3d 174, 193-194, 204 [substantial evidence supported determination that stock brokerage's office manager possessed broad degree of discretion required for managing agent, as it showed that he supervised and reviewed all 8,000 accounts in his office to ensure suitable securities were purchased and no improper "churning" occurred].

32

as there are no triable issues whether CRST is properly subject to punitive damages under the standards specified in section 3294, subdivision (b), CRST was entitled to summary adjudication on that issue.[17]

[17]     In a footnote, the Lennigs' return suggests that CRST's motion should be denied on another ground submitted to the trial court, namely, that CRST failed to comply with its discovery obligations.  As explained below, the Lennigs have forfeited their contention.

The contention relies on subdivision (h) of Code of Civil Procedure section 437c, which provides:  "If it appears from the affidavits submitted in opposition to a motion for summary judgment or summary adjudication, or both, that facts essential to justify opposition may exist but cannot . . . be presented, the court shall deny the motion, order a continuance to permit affidavits to be obtained or discovery to be had, or may make any other order as may be just."  Before the trial court, in opposing Contreras's and CRST's motions for summary adjudication, the Lennigs contended that Contreras and CRST improperly delayed Contreras's deposition, and that CRST destroyed e-mails by Stanek reflecting his suspicion that Contreras was intoxicated when the July 7, 2014 accident occurred.  However, in granting Contreras's motion, the trial court necessarily concluded that the delay in Contreras's deposition was not prejudicial, and that Stanek's post-accident suspicions raised no triable issue of fact. As the Lennigs have not challenged the ruling on Contreras's motion, they have forfeited their contention (see pt.D.1. of the Discussion, *ante*).

In a related contention, the Lennigs maintain that newly produced discovery shows that CRST was aware of several incidents of speeding by Contreras not reflected in the record relating to CRST's motion for summary adjudication.  We decline to examine that evidence, as our review of a writ petition is
*(Fn. continued on the next page.)*

## DISPOSITION

Let a peremptory writ of mandate issue directing that respondent trial court vacate its order denying petitioners' motion for summary adjudication regarding the requests for punitive damages against them, and enter a new order granting summary adjudication on that issue. The alternative writ, having served its purpose, is discharged, and the temporary stay is vacated effective upon the issuance of the remittitur. Petitioners are awarded their costs.

**CERTIFIED FOR PUBLICATION**

MANELLA, J.

We concur:

WILLHITE, Acting P. J.                COLLINS, J.

---

limited to the record before the trial court. (*Spaccia v. Superior Court* (2012) 209 Cal.App.4th 93, 96, fn. 2 & 97.)