Filed 3/4/22  Ron Blasco Real Estate v. FCA US CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| RON BLASCO REAL ESTATE, INC. et al., | |
| Plaintiffs and Appellants, | E072999 |
| v. | (Super.Ct.No. CIVDS1609641) |
| FCA US, LLC, | OPINION |
| Defendant and Respondent. | |

APPEAL from the Superior Court of San Bernardino County. Janet M. Frangie, Judge. Affirmed.

Knight Law Group, Steve B. Mikhov, Radomir R. Kirnos; Hackler Daghighian Martino & Novak, Sepehr Daghighian, Erik K. Schmitt; Greines, Martin, Stein & Richland, Cynthia E. Tobisman, and Gary J. Wax for Plaintiffs and Appellants.

Horvitz & Levy, Andrea L. Russi, Lisa Perrochet, Curt Cutting; Hawkins Parnell & Young, Barry R. Schirm, and Ryan K.C. Marden for Defendant and Respondent.

1

Appellants Blasco Real Estate, Inc. and Ron Blasco (Blasco) sued FCA US, LLC (Chrysler) for fraudulent concealment of problems with the Totally Integrated Power Module (TIPM) component of the 2011 Dodge Durango that Blasco purchased in June 2011. He also brought a claim under the Song-Beverly Consumer Warranty Act (Song-Beverly Act), Civil Code section 1790 et seq. (the "lemon law" statute) based on Chrysler's refusal to refund the purchase price when it became evident the car had substantial defects. He sought compensatory damages, punitive damages, and a civil penalty available under the Song-Beverly Act for willful refusal to refund the purchase price.

The trial judge, San Bernardino County Superior Court Judge Janet Frangie, ruled Chrysler had conceded violating the Song-Beverly Act, and a jury found Chrysler liable for fraudulent concealment and awarded Blasco the purchase price of the vehicle and a civil penalty of twice the compensatory damage award. However, the trial judge granted a nonsuit on Blasco's request for punitive damages on the fraud claim, and that issue did not go to the jury. The trial judge gave two reasons for her ruling—first, that there was insufficient evidence of punishable conduct by an officer, director, or managing agent at Chrysler and second, that awarding both the civil penalty under the Song-Beverly Act and punitive damages on the fraudulent concealment claim would constitute an improper double recovery.

Blasco argues he was entitled to recover punitive damages based on Chrysler's fraudulent concealment. He identifies evidence that specific Chrysler employees who had

2

knowledge of the defects were officers, directors, or managing agents of the company, which he argues was sufficient to send the issue of punitive damages to the jury. He also argues the severity of problems with the TIPM beginning in 2007 warrants the inference that higher-ups knew of the problem when Blasco purchased his vehicle. He argues both remedies were available because punitive damages would punish Chrysler for their fraudulent concealment of the problems with the TIPM component, which induced him to make the purchase in the first place, while the civil penalty punishes Chrysler's willful refusal to buy back the vehicle after it proved to have substantial problems. He contends the two acts were distinct and subject to separate punishments.

Chrysler defends the ruling on several grounds. First, they argue the trial judge was correct to conclude no evidence supported finding any of its officers, directors, or managing agents were responsible for the fraudulent concealment. Second, they attack the evidence of the underlying tort. They argue they were not obligated to inform consumers of the chance they would experience problems with the TIPM because they believed they would be able to address any problems under the vehicle warranties. They also argue Blasco offered no evidence anyone at Chrysler knew 2011 Durangos would have TIPM problems because he relied on evidence Chrysler had previously recalled different vehicle models due to flaws in a different version of the TIPM. They argue these last two deficiencies in the evidence establish Blasco suffered no prejudice from the trial

judge ruling because there was no ground for the jury's fraudulent concealment verdict and therefore no basis for awarding punitive damages.[1]

Finally, Chrysler argues the trial judge was right to conclude punitive damages would be duplicative of the Song-Beverly Act civil penalty. They argue the Legislature created a statutory scheme for awarding compensatory damages against a manufacturer who sells a "lemon" to a consumer and determined willful conduct violating the act gives rise to a maximum penalty of two times the amount of compensatory damages. They argue a punitive damages award for failing to notify the car-buying public of a potential defect would punish Chrysler a second time because the civil penalty already punished them for failing to repair the defect.

We conclude there was insufficient evidence that any managing agent of Chrysler was involved in the decision not to disclose problems with the TIPM component and affirm for that reason.

---

[1] Chrysler do not cross-appeal the jury's fraudulent concealment verdict, which ordinarily would prevent them from attacking the evidence supporting the verdict. They argue Code of Civil Procedure section 906 allows them to do so as a means of establishing Blasco suffered no prejudice from the punitive damages ruling because he wasn't entitled to any relief at all. We don't reach the issue because we conclude the trial judge correctly concluded there was insufficient evidence of corporate responsibility.

# I

## FACTS

A. *Blasco's 2011 Dodge Durango*

In June 2011, appellants Ron Blasco and his business, Blasco Real Estate, Inc., purchased a new 2011 Dodge Durango from Jeep Chrysler Dodge of Ontario, California for $42,802.[2] Chrysler, who are respondents and manufactured the vehicle, issued a three-year or 36,000-mile warranty and a five-year or 100,000-mile limited warranty. Blasco financed the purchase, but had paid the vehicle off in full by the time of trial.

In July 2011, less than a month after Blasco purchased the vehicle, Chrysler issued a "service bulletin" to its dealers, alerting them to an electrical problem in the 2011 Dodge Durango. A service bulletin functions as an addendum to the service manual. The bulletin reported the vehicles would sometimes fail to start and the remote keyless entry system wouldn't work. It prescribed a flash reprogramming of the wireless ignition node (WIN) module with new software to correct these problems. Blasco's expert witness said he attributed the problems to an "unsteady power supply through the TIPM-7 to the wireless ignition node."

The next month, in August 2011, Chrysler issued a second service bulletin about TIPM failures in 2011 Dodge Durangos and several other vehicle models. The bulletin reported "[t]he vehicle theft alarm intermittently sounds for no apparent reason," and "[m]ultiple attempts are required to start the vehicle before the vehicle will start."

---

[2] Blasco sued the dealer as well as Chrysler, but they were dismissed with prejudice after a settlement.

Chrysler recommended dealers "Flash reprogram the TIPM" to resolve the problems. These service bulletins are not public documents, and Chrysler did not make them available to purchasers like Blasco. Blasco testified the dealer never told him that Chrysler had identified problems with the electrical system of the Durango when he purchased the vehicle.

Over the next two years, Blasco reported and sought service for multiple problems with his vehicle's electrical system. The warning lights on the dashboard came on, including the check engine light. The hazard lights turned on for no reason a few times. Chrysler was unable to verify that problem, and it stopped occurring. The spare remote key failed to unlock the doors or start the vehicle. Later, the dashboard lights came on again and the vehicle wouldn't go any faster than 45 miles per hour. Though Chrysler told him these problems were fixed after he presented the vehicle for service, Blasco said his problems with the vehicle continued.

Later Blasco brought his vehicle back to the dealer to report yet more serious electrical failures. First, in September 2013, the vehicle wouldn't start. Blasco would press the start button, but the "engine would just start to crank and keep cranking and not start." Blasco said he took the car in for service after this problem happened two or three times, but the problem persisted. Chrysler told him they had to order a part and asked him to bring the car back later. To address the failure to start, the dealer ordered a new TIPM, but had none in stock for an immediate fix. According to Blasco's expert mechanic, Thomas Lepper, Chrysler had a problem with TIPMs being on backorder because "there

6

were so many failures, they couldn't make them fast enough." He said, "I saw a lot of the Chrysler work on that, even to the point of them going through and seeing if they could refurbish them. So they just had to do something, and the external relay was the patch."

A month later, Blasco took the car back in because it was exhibiting a new problem. He would start the car, "step on the gas and it felt like it wanted to go and then it would just stop. The entire engine would shut off." This problem would occur while he was driving the car. "It would be like at a stop sign, you step on the gas and it starts to go and then it just stops." The car continued to exhibit the crank and no start problem, which he said happened about 50 times over the years he owned the vehicle. The dealer again told Blasco they would have to order the part to complete a repair. No one told Blasco Chrysler knew customers across the country were reporting the same "intermittent crank" and "no start" defects or that Chrysler had issued a service bulletin on his vehicle instructing its dealers how to bypass the TIPM to get the car running.

Following Chrysler's instructions, the dealer did perform a bypass to move the fuel pump relay outside the TIPM. As Lepper testified, the fuel pump is a small electric pump that sends gas from the gas tank over to the engine. The fuel pump receives electricity from the fuel pump relay, which is a small switch located inside the TIPM. When the fuel pump relay doesn't work, the fuel pump won't receive electricity, and the engine will die or fail to start. Installing the fuel pump relay bypass involved installing a new fuel pump relay on the outside of the TIPM unit with the goal of getting electricity consistently to the fuel pump. Lepper explained Chrysler "identified the problem [was]

the printed circuit boards inside the circuit board with the TIPM [were] overheating. They realized that the current draw from that built-in fuel pump relay was causing that. So this was developed to get that electrical load out of the TIPM and run it through a relay that's separate."

When Blasco picked up the vehicle after the dealer installed the fuel pump relay bypass, they told him it was fixed. However, Chrysler's engineers privately called the bypass procedure a "MacGyver trick" and "a temporary work around to get cars back on the road." Blasco's expert mechanic opined that the workaround was not an adequate remedy. "I believe the problems with the TIPM and the unsteady power supply that it provides to the vehicle has affected his safety of the vehicle, has affected his use of the vehicle and will affect the value of his vehicle. I think the repairs that were done to this vehicle were both unreasonable in what they were trying to do. They knew it wouldn't work. I think they were unreasonable because the amount of times they tried the same thing."

Lepper testified that many of the problems with the electrical system traced to the vehicle's TIPM. He explained the factory fuel pump relay "overworks the circuit board, overheats the circuit board, and causes either the engine to stall or not start. That then compounds into other areas where that overheated circuit board won't properly flow electricity and affects windshield wipers, the alarm system, the hazard lights. Anything that electrically that gets funneled through the TIPM can be affected by the problems with it overheating." He said he had seen the problem with the illumination of the brake,

traction, and ABS lights in other vehicle models with TIPMs. He explained, "what's happening here is the fuel pump relay is overheating the circuit board and the power won't flow through. When you get an electrical item hot . . . you burn your fingers, but that resistance sucks up a lot of electricity. There's not enough power left to supply the systems. . . . So when that happens it's not transferring the power out, and these various systems don't have enough power to work and will shut down." He said the same problem caused the malfunctioning of the hazard lights, which was "a known problem on TIPM vehicles." "What's happening there is we're getting enough problems in the TIPM. It's overheating the [hazard light] relay and is turning on and holding itself on because of that heat." He testified the overheating also caused the problems Blasco experienced with the remote key fob, the check engine light, the exhaust cam phasers, dashboard light illumination, and limited acceleration. He said the failure to start was a problem which went "[r]ight to the heart of TIPM problems," which is why Chrysler responded by ordering him a new TIPM, though the part was out of stock.

Blasco continued to have problems with the vehicle after the dealer performed the fuel pump relay bypass. Though they told him at the time that the problem was fixed, the car continued to have trouble starting and continued to stall while being driven. He also later reported problems with the key fob not working, the check engine light coming on, the dashboard lights coming on. Blasco stopped driving the vehicle because the electrical defects were never resolved, and he was concerned stalling could cause the car to crash. He said at the time of trial the car was no longer in working condition.

9

B. *Blasco's Attempt to Get a Refund*

Concerned with the continued problems, with ensuring he had reliable transportation, and with his safety, Blasco decided to call Chrysler's customer service number to report his vehicle was a lemon and request a refund. The agent who took his call advised Blasco she would look into the matter and put him on hold. Blasco waited for about 30 minutes, but he was disconnected and no one called him back.

The next day, Blasco's wife called the customer service line. She told the agent they had spoken to an attorney who recommended calling Chrysler again to resolve the issue before hiring counsel and filing a lawsuit. She reported the vehicle had "a lot of problems" and asked Chrysler to refund them the purchase price. Blasco got on the phone because the car was in his name. Chrysler's agent told him the vehicle didn't qualify for a buyback and also said they couldn't talk to him any more if he was working with an attorney.

Blasco then hired an attorney. He later learned there was a class action suit against Chrysler, and he was a putative class member. In October 2015, he opted out of the class because he didn't think a settlement would make him whole. He said he had been a member in other class actions and received minimal compensation. Blasco said he understood Chrysler ultimately offered to settle with the class by offering an extended warranty on the fuel pump relay and a lifetime warranty on the TIPM. He said he found that inadequate because he had already purchased a lifetime warranty on the vehicle.

On March 4, 2016, five months after he had opted out, Chrysler sent Blasco a letter offering to repurchase his vehicle for "the actual price paid or payable for that vehicle, including any incidental and consequential expenses incurred," in compliance with the Song-Beverly Act. Blasco said he felt the offer was too little too late. By that point, he had hired an attorney and learned his car model had multiple electrical problems going back several years and that Chrysler knew about them. He said he felt cheated because, "if they knew that they had all those problems, they should have either fixed them or replaced the parts or do whatever they had to do to get the car so that it would keep running." Rather than accept their offer, Blasco filed this lawsuit in June 2016.

Blasco still has the Durango, but it doesn't run, and he bought another vehicle to replace it.

C.  *Chrysler's Knowledge of the Problems with TIPMs*

A TIPM—which includes a circuit board—is essentially "a smart fuse box," or power "hub" for the vehicle. A TIPM processes power from a vehicle's alternator and battery and distributes it to the components that use power to function, like windshield wipers, headlights, the fuel pump, and the ignition. A TIPM isn't supposed to wear out or be replaced; it's a component meant to work for the life of the vehicle.

According to Blasco's expert mechanic, Thomas Lepper, problems with Chrysler's TIPMs have resulted in the malfunction of numerous electrical components of their vehicles. He testified the biggest problem is with the fuel pump relay. "It overworks the circuit board, overheats the circuit board, and causes either the engine to stall or not

11

start. That then compounds into other areas where that overheated circuit board won't properly flow electricity and affects windshield wipers, the alarm system, the hazard lights. Anything that electrically gets funneled through the TIPM can be affected by the problems with it overheating." As we've discussed, he testified that several of the problems Blasco had with the Durango were caused by the TIPM. He also testified these were problems Chrysler was having with earlier models of vehicles with TIPM modules.

Before Blasco purchased his vehicle, Chrysler employees knew about problems with its TIPM components and electrical systems in several other models of vehicles. Lepper said Chrysler first started noticing problems with the TIPM component in 2007, and in July 2007 there was a safety recall of the version of the TIPM installed in 2007 Wranglers and 2007 Nitros. Though the TIPM in use at that time had a slightly different model number, Lepper testified it was substantially the same. The problems included the same failure to start and stalling problems Blasco experienced with his later model Durango. According to the expert mechanic, the problems were the same, and the evidence showed Chrysler knew about the problems that would come to affect Blasco's vehicle. "[I]t shows the problem with the TIPM, the known problems with the TIPM, the attempts to patch the TIPM, all these things occurred before Mr. Blasco even bought his truck."

Lepper said he had reviewed internal Chrysler documents related to the problems as well as documents related to a government investigation. He said Chrysler tried different fixes over the years. When the recall issued, "they were trying to control the

electrical load through the TIPM, such that it wouldn't let the engine stall" by installing "a new flash program to control that power flow." However, Chrysler vehicles were still stalling due to problems with power flow through the TIPM in 2009.

In 2009, a group of Chrysler engineers discussed the problem by e-mail. One engineer, Rick Peck, wrote, "How about you fix the TIPM since it is the root cause of the failures?" Nazmi Sabi responded, "Yes there is a fix for the TIPM in 2011. But what I am talking about is a field fix and the remaining of 2010 [model year]." Peck suggested Sabi's group "fix the TIPM for 2010 as a V2 rather [than] have me do it. Pull your changes into 2010 and fix the issue." Nazmi responded that kind of fix couldn't be accomplished for 2010 models, and reiterated that Peck's group might be the right one to design the fix because of their "expertise about relays and wire harnesses," but acknowledged "If we have to go to service for a field fix we will do so."

According to Blasco's expert, Chrysler hadn't found the root cause of the problems by the time Blasco bought his vehicle, and they were still trying to find a way to stop the malfunctions. First, they issued a service bulletin in July 2011, one month after Blasco purchased his vehicle, trying to address the problems with starting the engine and the using key fob. That bulletin prescribed reprogramming the wireless ignition node. Then in August 2011, they issued a second service bulletin recommending Chrysler mechanics perform a fuel pump relay bypass, which involved taking "the fuel pump relay module out, doubl[ing] its size, . . . and set[ting] it out where it will be cooler and not

affect the circuit board of the TIPM." As we discussed above, the dealer performed this bypass fix on Blasco's car in late 2013.

By 2013, Chrysler engineers had come to believe heat generated in the TIPM was causing a protective conformal coating made of silicone to melt and interfere with other relays in the TIPM module. On August 21, 2013, a Chrysler engineer named Dennis Gauthier e-mailed a group of Chrysler engineers and engineers from the company who manufactured the TIPM module to explain the source of the problem. "According to different studies, silicone in a gaseous state can cover the contacts in a relay, increase the resistance, and subsequently reduce the life of the relay. This is why [the relay manufacturer] states that the use of silicone is highly prohibited." Lepper explained Gauthier was telling them "the problem's a lot greater than they think. He's giving them a quick overview of the silicone and how it off-gases it into silane and contaminating the relays." "We saw the physical effects of that discussion. We saw how that melted silicone was in there contaminating that relay. It looked like a fried egg or a bunch of short circuits within the contact points. And we saw the effect of heat damaging those contact points."

By mid to late 2013, Chrysler had also figured out the fuel pump relay was the component generating the heat which was melting the conformal coating and damaging other relays. In May 2013, they began recommending their dealers perform the fuel pump relay bypass to remove the source of heat from inside the TIPM. On September 27, 2013, Christopher Pare, whose e-mail signature identifies him as a manager of body electronics,

14

wrote to other Chrysler engineers, "There is an issue with TIPM failure on 2011 [Cherokees and Durangos] with the fuel pump relay. It was found that [the TIPM manufacturer] was conformal coating the boards with a product containing silicon. The higher current draw for the fuel pump is shown to cause failure over time. This same conformal coating was used through March 2013. Service is running short on TIPMs, and several techs are coming up with alternate, unapproved work around methods." Lepper said these documents "strengthen my opinion and backed it up. We see that they are finding problems with the [con]formal coating. We find that there are problems, they acknowledge the problems with the TIPM, and the fuel pump power is the central issue at this time."

Though the dealer performed the fuel pump relay bypass on Blasco's vehicle, it continued to have the same problems, even up to the time the parties' expert mechanics inspected the vehicle in preparation for this litigation.

Blasco put on an expert witness, Dr. Barbara Luna, to testify as an expert fraud examiner. She spoke about Chrysler's problems with the TIPM units and focused on the extent to which officers, directors, and managing agents of Chrysler were aware of the TIPM problems. She also testified about damages, including how a punitive damages award would relate to the net worth of Chrysler.

Dr. Luna identified Alan Amici as a high level management employee who was aware of problems with the TIPM. She said she had reviewed e-mails produced by Chrysler to determine whether upper management in the company understood the

15

problems. She said, "[T]he corrective action process issue detail reports shows as early as 2007 a fellow by the name of Alan Amici . . . knew about a number of TIPM problems and was on the team as [Chrysler] was testing TIPM issues." She said, based on her review of Chrysler's e-mails, Amici knew about the TIPM problems beginning in 2007 and continuing through 2011. She concluded that "prior to [Blasco's] purchase of the Durango I would say that what I have information is this fellow Alan Amici" was aware of the problems with the TIPM.

Dr. Luna described how she reached her conclusions about the positions and responsibility of Chrysler's employees. She said she concluded Amici was a "high up management person" by "looking at his position we looked at the e-mails to see what the positions were." She described her team's process of reviewing Chrysler's documents to identify potential management personnel and explained that she supplemented that work with searches on the business social media site LinkedIn. "Where we didn't see the positions, we then looked up people on LinkedIn to try to get their positions. And he did have a LinkedIn page as well, and it showed that he, at the time of the—when he first started in 2007, he was a director. And by 2009, I believe, he was a vice president." In Amici's case, she didn't identify in her testimony specific documents that led her to conclude Amici had a management position or was aware of the problems with the TIPM. In his briefs in this court, Blasco relies on Dr. Luna's testimony rather than cite documents identifying Amici's knowledge or role.

16

In the end, Dr. Luna concluded Amici's position of director put him in an "upper management" position at Chrysler. She said Amici was "responsible for a group that was investigating the TIPM and electrical issues." He "supervis[ed] a number of the engineering folks in the electrical area" and was copied on "corrective action" reports along with other senior engineers. However, on cross-examination, she acknowledged she didn't know how many people he supervised. She said he was on "a whole big string of people investigating the TIPM from, you could see on the various corrective action issue process detail reports. I assumed he was supervising those people." Asked what Amici's job duties were in 2011, she responded, "He would be supervising a number of the engineering folks in the electrical area. I think I could get out the page from LinkedIn if you want me to." She said it was "[p]robably true" that Amici was not an officer of Chrysler and that he was not a member of its board of directors. She refused to say whether he was a "managing agent," calling that a legal conclusion. She also acknowledged she didn't know who Amici reported to, by name or title.

The only other "high level" Chrysler employee Dr. Luna identified was Matt Liddane, who she identified as the vice president of vehicle concepts integration, functional sciences and regulatory affairs/safety development and vice president of assistance and components. She said that was his position as of November 20, 2013 but acknowledged she didn't know his title or role at the time Blasco purchased his vehicle. The Chrysler document which mentions Liddane was an e-mail exchange from November 20, 2013 in which a product investigator wrote to an engineer that he had been

17

asked to put the TIPM malfunction issue "on the radar screen with Matt Liddane (in a regular review we have with him) tomorrow. Since the awareness of this issue is going to my VP in my organization . . . I just wanted to make sure your upper management chain is aware that there is an issue being investigated." The engineer responded that his team "will be meeting on Friday with Bustamante and root cause team to review status." He copied David Bustamante on the e-mail and asked him to "see below escalation to Liddane tomorrow." We know nothing else about Liddane's knowledge of the TIPM issue or his role at Chrysler either from Dr. Luna or the documents included in the record on appeal.

D. *Trial Court Rulings and Verdict*

Blasco and Blasco Real Estate, Inc., sued Chrysler, alleging Chrysler breached an express warranty under the Song-Beverly Act (Civ. Code, § 1793.2, subd. (d)) by failing to promptly repurchase or replace the vehicle after a reasonable number of repair opportunities. Blasco also sued for fraudulent concealment, alleging Chrysler knowingly concealed the TIPM modules in their vehicles were defective when he purchased his Durango. Blasco sought compensatory damages, a civil penalty equal to twice his actual damages, and punitive damages.

In their opening statement, Chrysler's attorney stated Chrysler remained willing to repurchase Blasco's vehicle. "FCA is here to stand behind its offer to repurchase the Plaintiffs' vehicle that was made in March of 2016." Blasco moved for a partial directed

verdict on his Song-Beverly Act claim based on what he construed as Chrysler's admission it was liable for failing to promptly repurchase his vehicle.

The trial judge granted Blasco's motion. She held the admission was a "strategic decision" binding on Chrysler. She directed a partial verdict in favor of Blasco and later instructed the jury that all six elements of the Song-Beverly Act claim were met, including that Chrysler failed to "promptly replace or buy back the vehicle." Chrysler has not appealed that ruling.

As a result, the only issues left for the jury to decide were (1) the amount of compensatory damages, (2) whether Chrysler's conduct was willful, justifying a civil penalty under the Song-Beverly Act, (3) whether Chrysler fraudulently concealed the problems with his vehicle's TIPM, (4) whether the evidence of fraud was sufficient to support an award of punitive damages, and if so, (5) the appropriate amount of punitive damages.

However, the trial judge took the punitive damages issues away from the jury. At the close of Blasco's evidence, Chrysler moved for a nonsuit on punitive damages. They argued there was insufficient evidence that a managing agent authorized or ratified Chrysler's fraudulent conduct. The trial judge granted Chrysler's motion. She held there was sufficient evidence to send the fraudulent concealment claim to the jury but ruled the evidence that Chrysler had acted with callous indifference and through the conduct of a managing agent did not meet the clear and convincing standard required to impose punitive damages.

The jury found Chrysler liable for fraudulent concealment. They also found

Chrysler had willfully failed to repurchase or replace Blasco's vehicle. The jury awarded

Blasco $39,030 in compensatory damages and $78,060 in civil penalties under the Song-

Beverly Act. The court entered judgment against Chrysler on the jury's verdict in the

amount of $121,107.

Blasco moved for a new trial based on the trial judge's punitive damages ruling.

The trial judge denied the motion, holding Blasco had not submitted sufficient evidence

to reach the jury on whether Chrysler's managing agents had knowledge of the TIPM

problems and, in the alternative, that awarding punitive damages would improperly

duplicate Blasco's recovery of civil penalties under the Song-Beverly Act.

Blasco filed a timely notice of appeal.

## II

## ANALYSIS

A. *Multiple Punishments*

Blasco challenges the trial judge's conclusion that allowing punitive damages on

top of the Song-Beverly Act civil penalties would constitute an improper double

recovery. Chrysler defends the order granting a nonsuit on that basis.

The principle against double recovery is sound, but it isn't implicated by this case.

"California courts have held that if a defendant is liable for a statutory penalty or multiple

damages under a statute, the award is punitive in nature, *and the award penalizes*

*essentially the same conduct* as an award of punitive damages. The plaintiff cannot

20

recover punitive damages in addition to that recovery but must elect its remedy." (*Fassberg Construction Co. v. Housing Authority of City of Los* Angeles (2007) 152 Cal.App.4th 720, 759-760, italics added.) Here, the punitive damages and the civil penalties punish *different conduct*. Specifically, Blasco alleged and proved Chrysler engaged in fraudulent concealment to induce him to purchase their vehicle, *and then later acted willfully* in violating his statutory rights to receive compensation under the lemon law statute. "It's not a double recovery to obtain damages from two separate allegations of misconduct." (*Cieslikowski v. Fiat Chrysler* (C.D.Cal., Dec. 21, 2020) 2020 WL 7868128, *3.)

We therefore conclude the trial court erred by relying on this principle as a basis for granting a nonsuit on punitive damages.

B. *Involvement of an Officer, Director, or Managing Agent*

Blasco argues the trial judge erred by granting a nonsuit on punitive damages because there was sufficient evidence to allow the jury to find Chrysler's managing agents knew the company was fraudulently concealing material information about the defects in the Durango Blasco purchased in June 2011, as well as that managing agents authorized or ratified the concealment.

The Legislature authorized the award of punitive damages (exemplary damages) in Civil Code section 3294. "In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may

21

recover damages for the sake of example and by way of punishing the defendant." (Civ. Code, § 3294, subd. (a).) The Legislature defined "malice" as "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others," "oppression" as "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights," and "fraud" as "intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." (Civ. Code, § 3294, subd. (c)(1)-(3).)

For the acts of an agent to expose an employer to punitive damages, the plaintiff must prove the defendant "had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud or malice." (Civ. Code, § 3294, subd. (b).) For a corporate employer to be liable for the acts of an agent, "the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation." (Civ. Code, § 3294, subd. (b).)

In specifying that the actor must be an officer, director, or managing agent, the Legislature sought to "avoid imposing punitive damages on employers who were merely negligent or reckless and to distinguish ordinary respondeat superior liability from

22

corporate liability for punitive damages." (*White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 572 (*White*).) The California Supreme Court interpreted these provisions as "limit[ing] corporate punitive damage liability to those employees who exercise substantial independent authority and judgment over decisions that ultimately determine corporate policy." (*Id.* at p. 573.) However, the "principal liability for punitive damages [is] not depend[ent] on [the] employees' managerial level." (*Id.* at pp. 576-577.) Only "supervisors who have broad discretionary powers and exercise substantial discretionary authority in the corporation could be managing agents." (*Id.* at p. 577.) As a result, "to demonstrate that an employee is a *true* managing agent under section 3294, subdivision (b), a plaintiff seeking punitive damages would have to show that the employee exercised substantial discretionary authority over significant aspects of a corporation's business." (*Ibid.*, italics added.)

As we've discussed, the trial judge determined the evidence was not sufficient to tie Chrysler's fraudulent concealment to a managing agent of the company. We review an order granting a nonsuit de novo, standing in the shoes of the trial judge to determine whether substantial evidence supported sending the issue to the jury. (*Saunders v. Taylor* (1996) 42 Cal.App.4th 1538, 1541.) "'A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor.' [Citation.] In determining the sufficiency of the evidence, the trial court must not weigh the evidence or consider the credibility of the witnesses. Instead, it must interpret all of the evidence most favorably to the plaintiff's

case and most strongly against the defendant, and must resolve all presumptions, inferences, conflicts, and doubts in favor of the plaintiff. If the plaintiff's claim is not supported by substantial evidence, then the defendant is entitled to a judgment as a matter of law, justifying the nonsuit.'" (*Mejia v. Community Hospital of San Bernardino* (2002) 99 Cal.App.4th 1448, 1458.) To convince us the evidence was sufficient to send the issue of punitive damages to the jury in this case, Blasco leans heavily on the testimony of Dr. Luna, his expert fraud examiner, to show Chrysler agents, Alan Amici and Matt Liddane, were managing agents who were involved in concealing defects in the TIPM units.

We agree with the trial judge that the evidence pertaining to Amici's role at Chrysler was not sufficient to establish he was a managing agent. Dr. Luna testified that documents produced by Chrysler showed Amici was aware of problems with the TIPM unit in 2007 and concluded that "prior to [Blasco's] purchase of the Durango I would say that what I have information is this fellow Alan Amici" was aware of the problems with the TIPM. However, her evidence that Amici was a managing agent was lacking. She refused to say he was a managing agent on the ground that was a legal conclusion. (Cf. *White*, *supra*, 21 Cal.4th at p. 567 [the scope of a corporate employee's discretion and authority under the managing agent test is a question of fact].) And though she did conclude he was a "high up management person" by looking at his position as listed in e-mails and on LinkedIn, she gathered no real information about his actual job duties. Dr. Luna didn't identify in her testimony any specific documents that led her to conclude Amici had substantial discretionary authority.

Blasco emphasizes Dr. Luna testified Amici was "responsible for a group that was investigating the TIPM and electrical issues" and "supervis[ed] a number of the engineering folks in the electrical area" and was copied on "corrective action" reports along with other senior engineers. However, she acknowledged she didn't know how many people he supervised, saying only that he was on "a whole big string of people investigating the TIPM" and had merely "*assume*[d] he was supervising those people." (Italics added.) She also concluded that in 2011 he was "supervising a number of the engineering folks in the electrical area," but offered no specific information about his responsibilities, and instead offered to read from a printout from Amici's LinkedIn profile (in the end she didn't). She also acknowledged Amici probably wasn't an officer of Chrysler, wasn't a member of its board of directors, and she admitted she didn't know who Amici reported to, by name or title. We conclude, as the trial judge did, that her testimony was insufficient to show Amici exercised any discretionary authority over significant aspects of Chrysler's business, much less substantial discretion over aspects of the business related specifically to addressing the problems they were having with TIPM modules. (*White*, *supra*, 21 Cal.4th at p. 577.)

"The determination whether employees act in a managerial capacity does not hinge solely on their level or position in the corporate hierarchy. [Citations.] 'Rather, the critical inquiry is the degree of discretion the employees possess in making decisions that will ultimately determine corporate policy.'" (*Hobbs v. Bateman Eichler, Hill Richards, Inc.* (1985) 164 Cal.App.3d 174, 193.) Dr. Luna's testimony focused almost exclusively

on Amici's titles when he worked at Chrysler, and too little on his degree of discretion in making corporate decisions. Dr. Luna said he was a "director" in 2007 and promoted to vice president in 2009, but we know nothing of the scope of his responsibilities, we have no indication that he exercised discretion in carrying out his job, and even the evidence that he was involved in the project of addressing problems with the TIPM units is underwhelming. We know only that he was copied on some e-mails and reports. Even then, we have only Dr. Luna's assurances, as the e-mails and reports in the appellate record are not linked to him. The bottom line is Blasco did not provide sufficient information about Amici to justify concluding he exercised substantial discretion in setting Chrysler's response to the TIPM issue and therefore warrant imposing punitive damages on Chrysler.

Though Dr. Luna also emphasized the role of Matt Liddane, who as a vice president was informed of the ongoing TIPM problem in 2013, Dr. Luna's testimony about his role in the corporation's decision-making was even less informative. One document mentions the need to inform Liddane about the malfunction "to make sure your upper management chain is aware that there is an issue being investigated." However, this occurred in 2103 and Dr. Luna provided no other information about Liddane's knowledge of the TIPM issue or his role at Chrysler. Such limited evidence is not sufficient to tie a managing agent to the decision to keep the TIPM problems from the public at the time Blasco purchased the vehicle or to show someone responsible at Chrysler authorized or ratified the decision.

26

The contrast with the cases Blasco relies on is stark. In *White*, the corporate employee, Salla, "[a]s the zone manager for Ultramar, . . . was responsible for managing eight stores, including two stores in the San Diego area, and at least sixty-five employees. The individual store managers reported to her, and Salla reported to department heads in the corporation's retail management department." (*White*, *supra*, 21 Cal.4th at p. 577.) Moreover, Salla's superiors testified "they delegated most, if not all, of the responsibility for running these stores to her." (*Ibid.*) In *Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, the corporate employees were insurance claims department managers. One of them testified "he was manager of the Los Angeles claims department for Mutual, and in that capacity had ultimate supervisory and decisional authority regarding the disposition of all claims, like that of plaintiff, processed through the Los Angeles office." (*Id*. at p. 823.) No one in this case offered comparable testimony.

The difference is even more marked in *Mazik v. Geico General Ins. Co.* (2019) 35 Cal.App.5th 455. There, the corporate employee was a regional liability administrator for Geico with responsibility for the settlement of insurance claims in Orange County, Los Angeles, San Bernardino, and Alaska. (*Id.* at p. 465.) The employee testified about his own role and said he had approval authority over 100 claims adjusters for claims up to $50,000, which required him to have about 18 to 20 meetings a day with claims adjusters seeking his approval or direction for handling claims. (*Id.* at pp. 465-466.) Moreover, he testified it was "an important part of his job . . . to establish settlement standards within

his region" for the purpose of maintaining consistency in settlement valuations. (*Id.* at p. 466.)

The other cases Blasco cites are similar. In *Hobbs v. Bateman Eichler, Hill Richards, Inc.*, *supra*, 164 Cal.App.3d at p. 193, the corporate agent "testified that he was the office manager and he signed himself as such on the Customer Option Agreement and Information Form. . . . [He] stated that he supervised the trades being made for clients to be certain no advantage was taken of them, that he supervised all 8,000 accounts in the office, that semi-annually he checked to see if suitable securities were being purchased for clients, that he was responsible for making sure the accounts were not being 'churned,' and that in general he was in charge of compliance in the Woodland Hills office." He also testified that he had authorized the specific purchases challenged in the lawsuit after the fact despite knowing the customer hadn't agreed to that kind of purchase and said he would approve them again if presented with the same situation in the future. (*Id.* at pp. 193-194.) In *Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1220-1221, the Court of Appeal held there was sufficient evidence an employee of an insurance company was a managing agent where she managed 35 employees, oversaw the claims operation, supervised lower ranking supervisors, trained adjusters, supervised some files, authorized payment of benefits, and "made the decision to refuse to pay the benefits ultimately awarded by the jury on the basis, later proven untrue, that the receipts were illegible because they were faxed." In *Powerhouse Motorsports Group, Inc. v. Yamaha Motor Corp., U.S.A.* (2013) 221 Cal.App.4th 867, 886, the Court of Appeal

upheld the jury's finding that an employee was a managing agent where "[t]he evidence established [he] was the 'Regional Sales Manager for the Western Region' which included . . . between 140 and 240 dealerships. He managed a group of 'district managers' and, as he testified, was 'ultimately responsible for the total well-being of Yamaha Motor Corporation Dealers.' Further, evidence shows that [he] was directly involved in the Powerhouse/MDK sale and was responsible for the decision to terminate the dealership." These cases show the kind of evidence required to establish a corporate employee was acting as a managing agent, and Blasco simply failed to meet that mark.

Blasco relies on *Romo v. Ford Motor Co.* (2002) 99 Cal.App.4th 1115, 1139, certiorari granted and judgment vacated by *Ford Motor Co. v. Romo* (2003) 538 U.S. 1028, to argue we should conclude the evidence showing the information in Chrysler's possession together with the evidence about the structure of management decisionmaking "permits an inference that the information in fact moved upward to a point where corporate policy was formulated." However, what was at issue in *Romo* was the entire process of "design, production, and marketing of an automobile," which involved the entire organization in the acts that constituted malice—specifically, the decisions to ignore the corporation's own safety standards for vehicle roof strength, not to test the roof strength prior to production, and to create the appearance of including the roll bar in the roof structure. (*Romo v. Ford*, at pp. 1139-1140, 1144-1145.) When the company later tested the vehicle, it turned out, unsurprisingly, to be unsafe. (*Ibid.*) A former Ford executive testified that "in the ordinary course of business, the responsible executives

29

*within* the light truck division would have known about the safety engineers' conclusions concerning the use of unreinforced fiberglass for passenger compartment panels. These executives clearly had the power within the corporation to enforce or not enforce as company policy the safety engineers' findings." (*Id.* at p. 1145.) That executive's testimony tied the malicious conduct directly to the corporation in a way that properly put it on the hook for punitive damages despite the lack of evidence tying the malicious conduct to a specific actor. In this case, the problem involved the operation of a module in the vehicle and there was no testimony establishing that decisions about the problem would make their way up the chain of command before the new vehicles went into production. We conclude Blasco failed to "present evidence that 'permits a clear and convincing inference that within the corporate hierarchy authorized persons acted despicably in "willful and conscious disregard of the rights or safety of others."'" (*Butte Fire Cases* (2018) 24 Cal.App.5th 1150, 1173, as mod., rehg. den.)

Blasco also argues the jury should have been allowed to infer corporate knowledge of the ongoing problems with the TIPM based on the "recall in 2007 regarding *the same TIPM model that was later used in Blasco's vehicle*." While it is true that Blasco's expert mechanic testified the TIPM modules in the 2007 vehicles and the 2011 vehicles were substantially the same, we don't believe the jury could infer from the mandatory recall in 2007 that managing agents of the corporation knew the same issues persisted in 2011. The reason is simple. The recall required action on Chrysler's part to address the problem they had identified, and the fix involved a software update designed to relieve the

problem. Blasco's expert mechanic testified that Chrysler tried "to control the electrical load through the TIPM, such that it wouldn't let the engine stall" by installing "a new flash program to control that power flow," but that problems with the TIPM continued to plague Chrysler vehicles in 2009. Whether the fix simply failed is open to question, but the fact that Chrysler undertook to repair the problem—absent evidence that they knew the fix was a sham or that managing agents became aware the problem persisted despite the repair—cuts the link required to impose punitive damages on the corporation. In other words, though we agree with Blasco that "a reasonable jury could conclude that Chrysler's knowledge of a federal-government-triggered recall would rise to the top of Chrysler's corporate hierarchy," we don't agree a reasonable jury could conclude from that fact alone that Chrysler's knowledge of later problems with the same module had risen to the top of the hierarchy as well.

Blasco's reliance on *California Shipbuilding Corp. v. Industrial Acc. Commission* (1947) 31 Cal.2d 270, offers no further support. In that case, an employee "was burned by electricity when the boom of a locomotive crane . . . came in contact with a high-voltage electric line. (*Id.* at p. 272.) The employee sought compensatory damages but also an increase of compensatory damages under the Labor Code section 4553 on the basis that the maintenance of the unsafe work conditions was willful misconduct on the part of an executive, managing officer, or general superintendent. (*Id.* at p. 271.) The Industrial Accident Commission found the employee's injury "was proximately caused by the serious and wilful misconduct of the employer, consisting of a violation of" electrical

31

safety orders "which forbids operation of equipment which can be brought within 6 feet of high-voltage lines." (*Ibid.*) The California Supreme Court held the evidence supported the inference that managing agents were involved. (*Id.* at p. 274.) However, unlike in this case, the dangerous conditions were open and obvious. High-voltage wires had hung throughout the yard over a period of three and a half years. The employer had gradually taken some of the wires down because employees were running into them too often, and about a year before the most recent incident, "a similar accident involving the same crane had happened at about the same place under similar conditions," an accident that was "known to the superintendent of transportation and to the foreman who dispatched the crane to the road." (*Id.* at p. 273.) Here Blasco failed to make the evidentiary connection between the prior problems with the TIPM, which Chrysler management did know about, and the later problems with the same unit.

We also reject Blasco's argument that the jury could infer corporate awareness of the problems before Blasco purchased his vehicle from evidence that Chrysler's managing agents were aware of the TIPM problems in 2013 and chose not to disclose them at that time. Blasco relies on *Johnson v. Ford Motor Co.* (2005) 35 Cal.4th 1191, for the proposition that the evidence of later concealment could support the jury's inference that managing agents knew about the prior concealment or authorized or ratified it. However, in *Johnson*, the California Supreme Court was concerned with the distinct question whether evidence of conduct toward nonparties could justify a *larger* punitive damages award for plaintiff because "'such evidence may be relevant to the

determination of the degree of reprehensibility of the defendant's conduct.'" (*Id.* at pp. 1202-1203.) In other words, if Blasco had established corporate involvement in the fraudulent concealment before he purchased the vehicle, he could rely on the later concealment to establish Chrysler had an ongoing corporate policy and practice of concealing the problem to justify a larger punitive damages award, but he can't use that evidence of later concealment to establish corporate involvement in concealing the problem at the earlier time.

## III

## DISPOSITION

We affirm the judgment. Appellants shall pay costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH _____

J.

We concur:

MILLER _____

Acting P. J.

CODRINGTON _____

J.

33